[Civ. No. 5026.   Fourth Dist.   Jan. 12, 1955.]

MARGARET G. STEWART, Appellant, v. HENRY A. STEWART II, Respondent.

Will H. Winston for Appellant.

Leonard Di Miceli for Respondent.

GRIFFIN, J.—A former custodial order in this same action was before the Supreme Court in *Stewart* v. *Stewart*, 41 Cal. 2d 447 [260 P.2d 44], and the surrounding facts are there set forth. That appeal involved an order denying the application of the plaintiff in this action, the mother of a 9-year-old girl and an 11-year-old boy, for change of custody of the two children which had previously been given to the children's

paternal aunt and her husband, Mr. and Mrs. Haven. In that proceeding, the trial court did not find that the mother was unfit to have custody of the children. The boy is now approximately 14 and the girl approximately 11 years of age. The original determination of custody by the trial court was in accord with the agreement of the parents themselves to place custody in strangers, with certain limitations. The agreement anticipated that there might be, in the future, a contest concerning the fitness of the one asserting a right to their custody. The Supreme Court reversed the order and in its opinion stated that the issue of fitness should be tried out in the usual way with evidence and findings on the subject and that in the absence of sufficient evidence and a finding of unfitness on the part of the parent seeking custody the law of preference should take its course.

Subsequently, on December 7, 1953, another hearing was had in the trial court before another judge, upon the same application of plaintiff for change of custody to her and upon an application of defendant father for custody in case the paternal aunt and uncle were denied custody. Counsel for plaintiff attempted to limit the reception of evidence as to the present fitness of the mother and objected to any evidence pertaining to her past conduct. The court took the opposite view and considered the entire matter anew and received in evidence the original agreement between the plaintiff and defendant in the divorce action which was made a part of the interlocutory decree. It recited that it was stipulated by the parties:

". . . that no order shall be made herein at this time with reference to the fitness of either of the parties involving the care, custody and control of the minor children of the parties hereto, but that at any time in the future, should the question of custody of the said minors arise, evidence can be introduced by any interested party at the time of the hearing as to any acts or things, past or future, which might bear upon the question of the fitness of the party desiring such custody."

Proceeding upon this theory the trial judge, in the instant proceeding, received, over objections, a limited portion of such evidence. It is to be remembered that the defendant father was granted the divorce in the first instance upon his cross-complaint. It became final on February 9, 1950. On June 24, 1950, plaintiff remarried. She obtained a modification of the custodial order giving her the right to visit the children every other Sunday and to take them from the Havens' home

during certain hours. She exercised these rights until May, 1953. From June, 1953, to December 7, 1953, her visitations were less frequent. Plaintiff testified that since her remarriage she has been living in a three-bedroom home; that she was then working but desired to have the children in her home and if she obtains them she would quit her employment. She alleges that since the previous custodial orders were made, conditions and circumstances surrounding the parties have materially changed; that she is now happily married to Mr. Herleman; that they are fit and proper persons to have the care, custody and control of the children; and that she desires to have them. She alleged that difficulty had been experienced with the Havens over her visitation rights, and that this was not conducive to the best interests of the children. The Havens denied generally these claims and alleged that they were fit and proper persons to have custody of the children; that the mother was not a fit and proper person; that it would not be for the best interests of the children to change the custody; and that any such change would result in serious emotional disturbances to the children. The children's father alleged that he had remarried on June 19, 1952, to a widow with two children, aged 10 and 8 years respectively; that he had established a happy home and that the children here involved preferred to live with him if they could not remain with the Havens. He sought custody of them only in case any change was to be made.

In view of the apparent necessity of branding the mother as an unfit person before custody of her children may be awarded to a third party, regardless of the best interests and welfare of the children, as indicated in *Stewart* v. *Stewart*, 41 Cal.2d 447 [260 P.2d 44], and *Guardianship of Smith*, 42 Cal.2d 91 [265 P.2d 888], it becomes necessary, although not desirable, to relate, to some extent, the evidence on that subject which would support the trial court's finding that the mother was unfit, and which would support the order refusing to modify the previous order of custody. We have read the entire transcript of the testimony produced and the evidence considered. On the hearing on December 7, 1953, defendant Stewart, a commander in the United States Navy, testified he married plaintiff in 1937, and that their two children, whose custody is here in dispute, were born during their marriage; that he brought his wife to California and that they lived in various places in this state during their marriage; that while they were husband and wife, he and

his brother and one Case made an investigation in December, 1948, with respect to plaintiff's activities; that they went to Trabuco Oaks, after obtaining certain information, and found defendant's wife, plaintiff herein, in bed with a man who was a stranger to him and both were in a nude state; that plaintiff wanted to know what was going on, and she used "free language along with it"; that he told the stranger that this had been going on for some time and the stranger said he was sorry he did not know he was "getting into a situation like this." Defendant's testimony was corroborated by two other persons. Plaintiff did not deny this happening. Defendant also testified that on one occasion previous to their separation she entertained a male visitor in their home who was not "amicable" to defendant and defendant retired for the night; that in the fall of 1939 or the early part of 1940, defendant brought home a sailor boy and allowed him to use the spare bedroom for a few nights; that the next thing he knew plaintiff moved out and went with the sailor to live with him for several days; that plaintiff told defendant she just wanted to make up her mind as to whom she wanted to continue with as a wife; that he went to that house, took plaintiff's belongings, and brought them back to his house and that plaintiff returned to live with defendant; that in 1939 or 1940, plaintiff had a miscarriage and was taken to the hospital for attention; that on another occasion in 1941, defendant observed plaintiff embrace and kiss a lieutenant colonel who, plaintiff contends, was a close friend of both plaintiff and defendant; that on one occasion in 1946, he came home unexpectedly one evening and found baby sitters with the children and endeavored to find out where his wife was; that about 3 a. m. he heard a car drive up; that he went out and found plaintiff embracing another colonel and she was "so engrossed with the business at hand" that they paid no attention to defendant; that defendant told her to come in the house and she said: "Do you think this is it?"; that he remarked: "No, I don't"; that he was "going to try and make this thing work . . . maybe you will grow up some day." He then testified that he found out it was impossible to make it work and accordingly the divorce action was filed and later heard on February 1, 1949. The testimony of defendant is corroborated in many respects, and in fact much of it is admitted by the plaintiff. One of plaintiff's neighbors, as well as defendant's mother, testified that they lived next door to the Stewarts in 1948, 1949 or 1950; that in the evenings, quite

often, when defendant was away, a great number of men came to the neighbor's house looking for Mrs. Stewart's residence; that in 1948, one of the lieutenant colonels above mentioned was married and that Mrs. Stewart was crying about this fact and seemed to be greatly upset about it because they were such close friends; that plaintiff neglected her home and the children, and when she left them with the neighbors they would feed and bathe them because they were hungry and dirty, and that the home of plaintiff was untidy; that plaintiff would leave the children with the neighbors in the morning and would not return until late in the evening; that men friends visited plaintiff; that on occasions plaintiff would be gone several days at a time with a man and return with him, and that defendant's mother would take care of the children; that the automobile of one lieutenant colonel would be at the plaintiff's home all night on occasions. One other neighbor said plaintiff told her, about the time the divorce action was filed, that she, plaintiff, would fight for the custody of the children and if obtained she would take them away as far as she could so defendant would not see them; that the children were inadequately clothed and improperly fed, and since they have been with the Havens they have been in excellent hands and well behaved.

Mrs. Haven testified that the children seemed to be afraid of plaintiff and that the girl displayed emotional upsets and was sick at her stomach and nauseated when she was told that she might have to go back to her mother.

Considerable testimony was given in respect to the fitness of the Havens and of defendant to have custody of the children. There is practically no evidence to the contrary and the finding of the trial court that the Havens were such fit and proper persons is fully supported by the evidence.

The minor son testified that before the parties were separated and when defendant was away from home, a man came to the house at night; that he did not know if he stayed all night but in the morning the man would still be there; that this happened "every once in a while"; that the lieutenant colonel stayed all night on occasions; and that he would rather be with his father if he could not stay with the Havens; that when with plaintiff and her present husband on visiting days his stepfather became very angry at him and his sister if they spilled crumbs in the car; that plaintiff told them if she obtained custody of them they would not see the Havens again; and that he believed she also included their

father. The daughter corroborated this testimony to some extent and said plaintiff's husband used swear words in front of her and that her mother did too, "but not much." Plaintiff admitted giving birth to a claimed illegitimate child in January, 1950, and stated that she placed it out for adoption because she did not want anything to interfere with her having the custody of the children here involved. She denied that the lieutenant colonel stayed at her home overnight, denied being intimate with a man found in bed with her, and denied being intimate with the sailor boy or with anyone else.

The county probation officer investigated the case at the first hearing and reported that from 1946 to 1948 conditions were quite unsatisfactory and accordingly he did not recommend that the children be given over to the mother. It appears that on February 14, 1952, at the last hearing, he filed a supplemental report and therein stated that plaintiff and her present husband appear to be proper people to have custody of the Stewart children; that he knew plaintiff had given birth to an illegitimate child in 1950, and knew that she denied this fact under oath on a hearing on an order to show cause in October, 1950, but that this change of testimony under oath did not change his opinion of her present fitness; and that plaintiff's present home and the surroundings were quite satisfactory. He equally complimented the home of the Havens.

Plaintiff produced her personnel supervisor, as well as the superintendent of the naval shipyard where she is employed, and they testified she always conducted herself there as a lady since they had known her, which was during the past two and one-half years. One testified he had visited in plaintiff's home and that it was of a nice type. The priest of the Episcopal church where plaintiff attends was called as an expert on domestic counseling. He testified that plaintiff came to his church and that he visited in her home on occasions; that he was unfamiliar with her past actions although the birth of the illegitimate child would bear a great deal on the question of whether plaintiff was a fit and proper person, but that he believed she has repented herself of her evil; that what "happened in previous times is of consequence, perhaps, to the law, but not to the moral aspect of the church"; and that there is no substitute for the "mother person."

██ The first contention of plaintiff on this appeal is that in the light of the prior decision (*Stewart* v. *Stewart, supra*)

the only issue that should have been tried by the trial court was the issue of her fitness, and that the instant proceeding should not have been tried de novo. We see no merit to this. The decision did recite that the issue of fitness should be tried out in the usual way and findings made on the subject. However, the final order was a straight reversal of the order involved on the appeal, without directions. Accordingly, there was no limitation placed upon the trial court if it found, upon sufficient evidence, that plaintiff was unfit, to further inquire into the fitness of the other parties involved and to determine what was for the best interests of the children, particularly where the application of the father for custody was heard at the same time in the same proceedings. (*Estate of Pusey,* 177 Cal. 367 [170 P. 846] ; *Odlum* v. *Duffy,* 35 Cal.2d 562 [219 P.2d 785].)

The main point is the contention that a mother, in a custodial proceeding, is not bound by her former stipulation permitting inquiry into her past conduct upon the issue of her fitness, even though such stipulation is incorporated into an interlocutory decree of divorce.

Parents have a right to contract with each other as to the custody and control of their offspring, and to stipulate away their respective parental rights. Such contracts are binding upon them. (*Sargent* v. *Sargent,* 106 Cal. 541, 546 [39 P. 931].) However, we are inclined to the conclusion that such a contract should not be permitted to interfere with or impede, in a proper case, that wide discretionary power given to courts in the disposition of the custody of children, in accord with their best interests, or independently of the desire of a parent. (*Anderson* v. *Anderson,* 56 Cal.App. 87 [204 P. 426].) Since the question of the fitness of the mother parent seeking custody of minor children, as against strangers, involved her fitness at the time of the hearing on that question, as well as the question of the best interests of the children, the trial court was not bound by any stipulation of the parties as to the admissibility of evidence bearing on those questions, even though such stipulation is carried into the interlocutory decree of divorce. Since the court was not bound by the stipulation, and since the right attempted to be reserved by the stipulation (i.e., to produce such evidence in the future) was a right which the court already possessed and as to the court the stipulation of the parties was ineffectual, neither party may claim error in the reception of such evidence. (*Anderson* v. *Anderson, supra.*)

The next important question is the propriety of the receipt, over objections, of evidence of the past conduct of plaintiff. It is plaintiff's contention that the only question presented was whether or not she was a fit and proper person to have the custody of the children *at the time of the hearing*; that the admission of such evidence was limited to her fitness since her remarriage to Mr. Herleman in June, 1950; that since there was no evidence of her unfitness during that period, and since all the evidence showed her complete fitness since then, as between the mother and a stranger, plaintiff was, as a matter of law, entitled to the custody of the children. We do not believe that the plaintiff was the one who was entitled to select the date when she claims her former unfitness changed over to fitness. This was a question for the trial court to determine under all the circumstances related. ■ It is true that the question of whether a parent is a fit or proper person to have the custody of a minor child refers to his or her fitness at the time of the hearing, and is not necessarily controlled by conduct many years prior thereto. However, evidence of prior acts of misconduct may be admissible if it may be said to have a direct bearing on the issue of present unfitness, but such evidence should be limited to this issue alone. (*Wilkinson* v. *Wilkinson,* 105 Cal.App.2d 392 [233 P.2d 639].) The trial court endeavored to limit the evidence of plaintiff's conduct to a time subsequent to the birth of the children and while they were in her care and control, or during the time when plaintiff was given visitation rights with them. Several cases may be cited where the past conduct of one of the parents extended back several years and in which evidence of similar acts to those here charged was held to be properly admitted as bearing on the question of the parent's fitness. ■ Plaintiff's moral character, stability, acts, conduct, and disposition were relevant matters to be considered by the trial court. (*Guardianship of Coughlin,* 129 Cal.App.2d 290 [276 P.2d 841]; *In re Coughlin,* 101 Cal.App.2d 727 [226 P.2d 46].) ■ A mere recitation of the facts presented, including the past acts of misconduct of the plaintiff, clearly indicate that they may well have had a direct bearing on the present fitness of the plaintiff, and whether custody placed with her would promote the best mental, moral, temporal, and spiritual interests, growth and welfare of the children here involved. While the evidence might have supported a finding that plaintiff had reformed and therefore was a fit

and proper person to have custody at the time of the hearing, such is not the finding of the trial court. Its finding to the contrary has sufficient evidentiary support. ▮ An appellate court is required to consider only the evidence most strongly favoring the respondent, and it may not reverse a judgment if there is any substantial evidence, contradicted or uncontradicted which, together with the reasonable inferences to be drawn therefrom, will support the judgment. (*DeYoung* v. *DeYoung*, 27 Cal.2d 521 [165 P.2d 457] ; *Prouty* v. *Prouty*, 16 Cal.2d 190 [105 P.2d 295] ; *Gudelj* v. *Gudelj*, 41 Cal.2d 202 [259 P.2d 656].)

In *Crater* v. *Crater*, 135 Cal. 633 [67 P. 1049], it was held that the court, in modifying the decree as to the custody of the children, proceeds upon new facts, *considered in connection with facts formerly established*, including the change of circumstances, the conduct of the parties, the morals of the parents, their financial condition, subsequent marriage, the age of the children, and the devotion of either parent to the best interests and good of the children, which is the controlling force in directing their custody.

▮ An application for modification of an award of custody is addressed to the sound legal discretion of the trial court and an order granting or denying such a modification will be affirmed when there is no showing of any abuse of discretion. (*Fay* v. *Fay*, 12 Cal.2d 279 [83 P.2d 716].) No abuse of discretion here appears. This sufficiently disposes of the questions raised by the plaintiff on this appeal.

Order affirmed.

Barnard, P. J., and Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 9, 1955.