[Civ. No. 166. Fifth Dist. Mar. 21, 1963.]

ROGER ALFRED DENHAM, Plaintiff and Appellant, v. GENEVIEVE BLANCHE DENHAM MARTINA, Defendant and Respondent.

Barreiro & Dilling and James R. Dilling for Plaintiff and Appellant.

Walch, Griswold, Braden & Dittmar and S. C. Dittmar, Jr., for Defendant and Respondent.

CONLEY, P. J.—The central question involved on this appeal is whether the trial court followed applicable adjective law in the process of setting aside an order of over seven years' standing which gave the custody of two infants to their paternal grandparents in accordance with a property settlement agreement, and awarding their custody to their mother without making a finding relative to her fitness or unfitness, after an undue restriction of the evidence on the subject. The result that would follow an enforcement of the order appealed from would be that two healthy, happy, well-adjusted children would be permanently removed from their present home, their contact with the environment they have grown up in would be severed, their love for the people who have raised them in their formative years would be nullified, and they would, like pioneers in reverse, go to strange surroundings in a midwestern state, under the domination of a stepfather they have never seen, with a mother whose mental and moral fitness is at least subject to serious question; what, if any, advantage for the welfare of the children would result from such an enforced move is not apparent from the record. The circumstances of the case are such that our insistence upon a strict adherence to procedural law seems imperative.

On May 23, 1955, Roger Alfred Denham was granted an interlocutory decree of divorce from the respondent after a trial by default before another judge. Pursuant to the express terms of the property settlement agreement between the parties, the court awarded custody of the two children, Roger Gary Denham, then aged 2½ years, and Penny Denise Denham, aged 10 months, to the paternal grandparents, Ivo and Vera Denham. A final decree of divorce was entered on June

4, 1956, which approved and adopted the custody provisions of the interlocutory decree.

On June 18, 1962, over seven years after the interlocutory decree, Genevieve Blanche Denham Martina (now domiciled in Illinois and remarried for the third time since her divorce) filed an application for modification of the decrees as to child custody. On June 25, 1962, the plaintiff served and filed a notice of motion for modification of the interlocutory and final judgment of divorce, and the property settlement agreement incorporated by reference in the decrees; this motion was based on an affidavit, all of the records and proceedings in the action and additional oral evidence. The two applications were consolidated and heard by the trial court at the same time. Thus, each of the parents sought a modification of the previous interlocutory and final decrees, which pursuant to the written agreement of the parties to the divorce had awarded custody to the paternal grandparents; each of the two contests, tried together, was between one parent and the grandparents; the grandparents, though not represented by counsel, were personally present at the hearing. After hearing oral testimony the court made an order awarding custody of the two minor children to the defendant. Plaintiff promptly filed a notice of appeal; a petition in this court for a writ of supersedeas was granted on July 24, 1962 (*Denham* v. *Martina*, 206 Cal.App.2d 30 [23 Cal.Rptr. 757]).

The trial court has never found, at any stage of the case, that either parent was a fit or unfit person to have the custody of the children. During the hearing resulting in the order from which the present appeal was taken the judge who presided made remarks which indicated thinking both ways as to the fitness or unfitness of the parents, but the final conclusion of the court on this subject is not in the record, as no findings were made. The judge at one point during the hearing indicated that he would give major weight to the latter part of subdivision (2) of section 138 of the Civil Code, ". . . other things being equal, if the child is of tender years, custody should be given to the mother . . ."; this viewpoint would completely overlook the fact that when the children were babies (i.e., 10 months and 2½ years of age) the respondent apparently was deficient in motherly instinct as evidenced by her indifference to their custody; furthermore, such a viewpoint seems oblivious to the requirement stated in *Sanchez* v. *Sanchez*, 55 Cal.2d 118, 121 [10 Cal.Rptr. 261, 358 P.2d

533], that ". . . *primary consideration must be given to the welfare of the child.*" (Italics added.) (See also *Gudelj* v. *Gudelj*, 41 Cal.2d 202, 208 [259 P.2d 656]; Civ. Code, § 138, subd. (1); 36 So.Cal.L.Rev., no. 2, p. 257, note 14) and to the prerequisite that "other things" must be equal before the application of the precept favoring maternal custody. The phrase "tender years" as used in the statutory subformula has never been defined with exactitude. As is said in *Russell* v. *Russell*, 20 Cal.App. 457, 461 [129 P. 467]: "There cannot be any fixed and certain age of minority which, in all cases and for all purposes, can be said to constitute a child of 'tender years.'" (See also *Ludlow* v. *Ludlow*, 89 Cal.App.2d 610, 616 [201 P.2d 579].)

A careful and painstaking review of the entire record makes it extremely doubtful whether the respondent could be found to be a fit and proper person to be awarded custody of the children at this time. Genevieve Blanche Denham Martina admitted on the stand that when the interlocutory decree was issued she was "unstable, immature and not a very good, fit person to be a mother at that time." Since the interlocutory decree she has married three times. One of her intervening husbands was Russell Cadwell, Jr., who, incidentally, was a witness at the hearing. She testified that she went to Mexico with him before the final decree of divorce, ". . . got married one weekend and I went off to Reno the following week or so." She at that time wrote a letter to the plaintiff, saying that she believed that she was pregnant by Cadwell and that she wanted a divorce; she did not ask for custody of the children. The letter reads as follows:

"August 25, 1955
Thur. nite [*sic*]

"Dear Roger—

"Well as you know I am in Reno, trying to get a divorse [*sic*].

"Rog Please sign the pappers [*sic*]. I only want a divorse [*sic*] I don't want anything else. I'm not asking for the kids. You & I both know we couldn't have ever made it.

"I am going to have Russ's baby I'm almost sure. Anyway I've been getting a little sick—So Please Roger, if not for me, for the baby, I don't want my baby to be nameless. Please give me my freedom—that[']s all I'll ever ask of you.

"As Ever
Gen"

"P.S. Please!"

She testified that she knew she was not pregnant by Cadwell when she wrote the letter and that she then said that she was in order to gain appellant's consent to a divorce. The marriage to Cadwell was later annulled. She then married a second man and divorced him. In 1959 she married her present husband, Steven Martina, and since then has had one child, a boy. Mrs. Martina's testimony is uncertain as to whether this child was born only one month after her present marriage or at a later time. When she was asked the date she married her present husband, she replied "1959" in the month of "July." She twice gave 1959 as the date; when asked how old her son by her present husband was, she responded, ". . . he will be three August the 30th." However, when counsel for plaintiff asked, "Now, isn't it true, Mrs. Martina, that this present child you have by this man, he was conceived before your marriage, was he not?" She answered, "He was not." Thereafter she testified that ". . . when I got back four years ago, well, I got pregnant four months after I was married, and I had a baby, and I came out here and I went back, and. . . ." No explanation is given concerning this final testimony, or the specified contradictions in her evidence.

The record shows further that Mrs. Martina was for a time in a mental institution.

Mrs. Martina has visited the two children only three or four times in the past seven years. She admits that she has not remembered them by sending gifts on every birthday; she has never sent valentine greetings; she has from time to time written to their grandmother or to their father inquiring about the children, but "Not very often." She had not been in California for two years before June 1, 1962; arriving in Hanford on a Saturday night, she did not see the little boy or girl until the next Wednesday or Thursday, as they were then over on the coast. Respondent stated explicitly that she intends to take the children back to Chicago with her. These children have never been there and have never seen her husband, or any of the relatives of their mother living in Chicago.

Mrs. Ethel E. Donahue, mother of the respondent, testified that she has not seen the children very often, although she lived in Kings County where the paternal grandparents also resided. Under cross-examination, Mrs. Donahue admitted that the little boy and girl like their father very much and also that there was a time when her daughter was sick and

she was afraid for the safety of the children while they were with their mother.

Audrey Cox, sister of plaintiff, testified that the home occupied by appellant was adequate, that the neighborhood was "nice," that it was a happy home, that appellant and his wife were devoted to the children, and that the children loved their father very much. The witness also verified that during the past seven and one-half years the mother had made only four trips to California to see the children, and that even while she was here she did not visit with them every day, although she had the opportunity to do so and that the children do not appear to be affectionate toward the mother.

Louise Liggett, a neighbor, testified that the appellant's home appears to be a very happy one.

Russell Cadwell, Jr., stated that he married the respondent in July of 1955 (the final decree of divorce of Roger Denham from Genevieve Denham was entered, as heretofore stated, on June 4, 1956). Respondent told the witness after their marriage that she was expecting his child. Upon her arrival in Hanford in June of 1962 she contacted him and suggested that they meet to go out for an evening together. She made this request twice, but he refused.

Doctor Donald E. Upp has taken care of the children for the past five years, and they are in excellent physical condition.

Roger Alfred Denham testified that his home was adequate, that since the interlocutory decree of divorce the children have lived with him or his parents continuously; that the respondent has sent very few gifts or birthday cards to the children in the past seven years; that the children have received good grades in school and that their teachers have noted nothing wrong with either of the infants; that appellant and his present wife and the children attend mass regularly every Sunday; that appellant loves his children dearly, and in fact has shaped his entire life around them.

Florence Denham, appellant's present wife, said that she was willing to take care of the boy and girl and did not feel that it would be a burden.

Mrs. Martina testified that she and her husband had recently acquired a two-story brick house in a Chicago suburb, purchased about one month before the hearing; the property is encumbered by a mortgage. Mr. Martina is a truck driver, and according to his wife, makes from $12,000 to $15,000 annually working at hourly wages. Her 3-year-old son by Mr.

Martina would share a room with the Denham boy. The house is furnished. There is no testimony with respect to the attitude of Mr. Martina toward the acquisition of two new members of the family. Neither is there any evidence with respect to educational opportunities for the children. The respondent attends the Franklin Park Bible Church in Illinois; her husband goes to church with her occasionally.

Summarizing, the children have lived a happy, healthy life for more than seven years under the present arrangements. They love their father, and they are naturally attached to the people and the surroundings that they have been with through all the years of their early childhood. They are doing well in school, and educational opportunities are clearly available and are good. Their health is excellent, and this fact reflects the good care they have received. As opposed to this, they are ordered to the custody of their mother as to whom no finding is made concerning her fitness. That there may well be a question in an unprejudiced mind as to her mental and moral fitness for the purpose of caring for two additional children is apparent from the outline of the evidence already given.

There appears to be no showing on the face of the record how or in what respect the children will be benefited by being forced to leave their present home and go to strange and unaccustomed surroundings. That such a requirement has caused inquietude in the minds of the judges of our courts in the past is shown by the authorities on the subject. ■■ In the recent case of *Shaw* v. *Shaw,* 204 Cal.App.2d 210, 214 [22 Cal.Rptr. 193], it is said:

"It is established by a legion of decisions that a California court will not order a change in the custody of a minor child in the absence of a showing that the welfare of the child clearly requires it. (*Norton* v. *Norton,* 112 Cal.App.2d 358, 359 [245 P.2d 1108] ; *Sorrels* v. *Sorrels, supra,* 105 Cal.App.2d 465, 469 [234 P.2d 103] ; *Johnson* v. *Johnson,* 72 Cal.App.2d 721, 723-724 [165 P.2d 552].)"

Our courts have passed adversely upon a change of custody which would result in the removal of a young child from the environment in which he has grown up to a place unknown to him and peopled by strangers. In *Smith* v. *Smith,* 126 Cal.App.2d 65, 68 [271 P.2d 178], the court said:

"The order not only modified and clarified the visitation rights but absolutely changed the custody of the child from the mother to the father for a three-week period each year for the

purpose of taking the child out of the State of California, and no adequate showing was made why the custody of the child should be changed for this purpose. It was not shown how or in what manner the child would be benefited by such a change. (*Gantner* v. *Gantner*, 38 Cal.2d 691 [242 P.2d 329].)''

■ In *Ashwell* v. *Ashwell*, 135 Cal.App.2d 211, 217 [286 P.2d 983], in reversing an order for the modification of custody the court held: ''The prime question is, what is the effect upon the lives of the children and what will be the effect of a modified decree that disturbs their *settled life and compels them to make adjustments to a life with strangers.*'' (Italics added.) (See also *Guardianship of Shannon*, 218 Cal. 490, 493 [23 P.2d 1020].)

■ A reversal of the order is required on the authority of *Stewart* v. *Stewart*, 41 Cal.2d 447 [260 P.2d 44]. The basic facts in that case are almost identical with those in the present litigation. There the custody of an 8-year-old boy and a 6-year-old girl had been given to a paternal aunt and her husband pursuant to the wishes of the mother and father of the children as expressed in a property settlement agreement. The interlocutory decree was entered on Feburary 3, 1949, and on January 21, 1952, the mother filed an application for a modification of the order, asking that she be awarded the sole custody of the two children. The court made no findings in denying the modification, and the plaintiff appealed. The Supreme Court reversed the order, expressly stating (p. 453): ''*The issue of fitness should be tried out in the usual way with evidence and findings on the subject.*'' (Italics added.) (See also *Guardianship of Willis*, 123 Cal.App.2d 446, 449 [266 P.2d 944].)

After the reversal in the *Stewart* case it was tried again and appealed again. (*Stewart* v. *Stewart*, 130 Cal.App.2d 186 [278 P.2d 441].) The Fourth District Court of Appeal approved the holding of the trial court that the mother was unfit to have the custody of her children. In the course of the opinion the court points out that (p. 193): ''Parents have a right to contract with each other as to the custody and control of their offspring, and to stipulate away their respective parental rights. Such contracts are binding upon them.'' (Citing *Sargent* v. *Sargent*, 106 Cal. 541, 546 [39 P. 931].) The opinion goes on to say, however, that this does not deprive a court of its wide discretionary power at a later time to order a change of custody upon a proper showing. ■ A relevant point decided in the second *Stewart* case is that in

passing on factual matters bearing on the fitness or unfitness of a parent seeking custody of children, the court should properly receive evidence of past actions on the part of the parent, not for the purpose of deciding whether at an earlier time the parent was unfit or of punishing the parent for former immoral actions, but to cast light on the present fitness of the parent. As is said on page 194 of the opinion:

"It is true that the question of whether a parent is a fit or proper person to have the custody of a minor child refers to his or her fitness at the time of the hearing, and is not necessarily controlled by conduct many years prior thereto. However, evidence of prior acts of misconduct may be admissible if it may be said to have a direct bearing on the issue of present unfitness, but such evidence should be limited to this issue alone. (*Wilkinson* v. *Wilkinson*, 105 Cal.App.2d 392 [233 P.2d 639].) The trial court endeavored to limit the evidence of plaintiff's conduct to a time subsequent to the birth of the children and while they were in her care and control, or during the time when plaintiff was given visitation rights with them. Several cases may be cited where the past conduct of one of the parents extended back several years and in which evidence of similar acts to those here charged was held to be properly admitted as bearing on the question of the parent's fitness. Plaintiff's moral character, stability, acts, conduct, and disposition were relevant matters to be considered by the trial court. (*Guardianship of Coughlin,* 129 Cal.App. 2d 290 [276 P.2d 841]; *In re Coughlin,* 101 Cal.App.2d 727 [226 P.2d 46].) A mere recitation of the facts presented, including the past acts of misconduct of the plaintiff, clearly indicate that they may well have had a direct bearing on the present fitness of the plaintiff, and whether custody placed with her would promote the best mental, moral, temporal, and spiritual interests, growth and welfare of the children here involved. While the evidence might have supported a finding that plaintiff had reformed and therefore was a fit and proper person to have custody at the time of the hearing, such is not the finding of the trial court. Its finding to the contrary has sufficient evidentiary support." (See also *In re Holt* 121 Cal.App.2d 276, 279 [263 P.2d 50].)

 In the present case the trial judge erroneously restricted the inquiry by appellant's counsel as to previous actions on the part of the respondent. The record shows the following:.

"Q. Now, Mrs. Martina, you testified as to your previous marriages? A. Yes.

"Q. Now, you were married to Roger Denham how long? A. About three years.

"Q. I believe you stated that the reason for the divorce was that you were unstable, emotionally immature, and not a fit person to have the care of the children, was that correct? A. That is correct.

"Q. You indicated, I think, that was the reason for custody going to Mr. and Mrs. Denham, was it? Now, isn't it true that at that time that you were neglecting the children? A. I suppose I was.

"Q. Yes. Well, I mean, you suppose or were you? A. Yes, I wasn't a very good mother at the time.

"Q. In fact, that is what brought all this about, you were found at a party in a nude condition with other people, and this is what brought this about?

"Mr. Dittmar: Just a moment, I object to that, Your Honor. Certainly anything that went on prior to the divorce and the prior award of custody is not material. I think that the concession has been made that she was not a fit and proper person to be the mother at the time. The details, I don't think can be anymore damaging than the fact she has admitted it. It is purely useless.

"The Court: I can't go back and retry that phase of the case, gentlemen.

"Presumably, both parties, unless I miss my calculation, were found to be unfit to have the custody otherwise it would not have been awarded to the grandparents.

"Mr. Barreiro: That wasn't—weren't the facts, Your Honor, but we will bring those out later."

The judge who presided had not heard the divorce case; he should have received the evidence of past conduct to aid him in determining whether the respondent was presently a fit or unfit person to be awarded the custody of the children.

Under the rule in *Stewart* v. *Stewart, supra,* 41 Cal.2d 447, it is necessary to reverse the order so that the cause may be retried and findings made in the usual way as to the fitness or unfitness of each of the parents.

The order is reversed.

Brown (R. M.), J., and Stone, J., concurred.