[L.A. No. 31064. Aug. 7, 1979.]

In re the Marriage of ELLEN J. and WILLIAM T. CARNEY.
WILLIAM T. CARNEY, Appellant, v.
ELLEN J. CARNEY, Respondent.

## Counsel

Nichols & Rose, Mason H. Rose V, Marilyn Holle and Mary-Lynne Fisher for Appellant.

Evelle J. Younger, Attorney General, L. Stephen Porter, Assistant Attorney General, Anne S. Pressman and G. R. Overton, Deputy Attorneys General, and Robert Funk as Amici Curiae on behalf of Appellant.

Baird, Baird, Belgum & Buchanan, Baird, Baird, Wulfsberg, Belgum & Buchanan and Lawrence C. Buchanan for Respondent.

## Opinion

**MOSK, J.**—Appellant father (William) appeals from that portion of an interlocutory decree of dissolution which transfers custody of the two minor children of the marriage from himself to respondent mother (Ellen).

 In this case of first impression we are called upon to resolve an apparent conflict between two strong public policies: the requirement that a custody award serve the best interests of the child, and the moral and legal obligation of society to respect the civil rights of its physically handicapped members, including their right not to be deprived of their children because of their disability. As will appear, we hold that upon a realistic appraisal of the present-day capabilities of the physically handicapped, these policies can both be accommodated. The trial court herein failed to make such an appraisal, and instead premised its ruling on outdated stereotypes of both the parental role and the ability of the handicapped to fill that role. Such stereotypes have no place in our law. Accordingly, the order changing custody on this ground must be set aside as an abuse of discretion.

William and Ellen were married in New York in December 1968. Both were teenagers. Two sons were soon born of the union, the first in November 1969 and the second in January 1971. The parties separated shortly afterwards, and by written agreement executed in November 1972 Ellen relinquished custody of the boys to William. For reasons of employment he eventually moved to the West Coast. In September 1973 he began living with a young woman named Lori Rivera, and she acted as stepmother to the boys. In the following year William had a daughter by Lori, and she proceeded to raise all three children as their own.

In August 1976, while serving in the military reserve, William was injured in a jeep accident. The accident left him a quadriplegic, i.e., with paralyzed legs and impaired use of his arms and hands. He spent the next year recuperating in a veterans' hospital; his children visited him several times each week, and he came home nearly every weekend.[1] He also bought a van, and it was being fitted with a wheelchair lift and hand controls to permit him to drive.

In May 1977 William filed the present action for dissolution of his marriage. Ellen moved for an order awarding her immediate custody of both boys. It was undisputed that from the date of separation (Nov. 1972) until a few days before the hearing (Aug. 1977) Ellen did not once visit her young sons or make any contribution to their support. Throughout this period of almost five years her sole contact with the boys consisted of some telephone calls and a few letters and packages. Nevertheless the court ordered that the boys be taken from the custody of their father, and that Ellen be allowed to remove them forthwith to New York State.[2] Pursuant to stipulation of the parties, an interlocutory judgment of dissolution was entered at the same time. William appeals from that portion of the decree transferring custody of the children to Ellen.

William contends the trial court abused its discretion in making the award of custody.[3] Several principles are here applicable. ▉ First,

---

[1]He was scheduled to be discharged shortly after the trial proceedings herein.

[2]The court.also imposed substantial financial obligations on William. He was ordered to pay all future costs of transporting his sons back to California to visit him, plus $400 a month for child support, $1,000 for Ellen's attorney's fees, $800 for her travel and hotel expenses, and $750 for her court costs.

[3]He also contends the ruling violated his right to equal protection and due process of law. (*Adoption of Richardson* (1967) 251 Cal.App.2d 222, 239-240 [59 Cal.Rptr. 323]; see generally Achtenberg, *Law and the Physically Disabled: An Update with Constitutional Implications* (1976) 8 Sw.U.L.Rev. 847; Burgdorf & Burgdorf, *A History of Unequal Treatment: The Qualifications of Handicapped Persons as a "Suspect Class" Under the*

since it was amended in 1972 the code no longer requires or permits the trial courts to favor the mother in determining proper custody of a child "of tender years." (E.g., *White* v. *White* (1952) 109 Cal.App.2d 522, 523 [240 P.2d 1015].) Civil Code section 4600 now declares that custody should be awarded "To either parent according to the best interests of the child." (*Id.,* subd. (a).) Regardless of the age of the minor, therefore, fathers now have equal custody rights with mothers; the sole concern, as it should be, is "the best interests of the child." (See *Taber* v. *Taber* (1930) 209 Cal. 755, 756-757 [290 P. 36].)

■ Next, those "best interests" are at issue here in a special way: this is not the usual case in which the parents have just separated and the choice of custody is being made for the first time. In such instances the trial court rightly has a broad discretion. (*Gudelj* v. *Gudelj* (1953) 41 Cal.2d 202, 208-209 [259 P.2d 656].) Here, although this is the first actual court order on the issue, we deal in effect with a complete *change* in custody: after the children had lived with William for almost five years—virtually all their lives up to that point—Ellen sought to remove them abruptly from the only home they could remember to a wholly new environment some 3,000 miles away.

■ It is settled that to justify ordering a change in custody there must generally be a persuasive showing of changed circumstances affecting the child. (*Goto* v. *Goto* (1959) 52 Cal.2d 118, 122-123 [338 P.2d 450].) And that change must be substantial: a child will not be removed from the prior custody of one parent and given to the other "unless the material facts and circumstances occurring subsequently are of a kind to render it essential or expedient for the welfare of the child that there be a change." (*Washburn* v. *Washburn* (1942) 49 Cal.App.2d 581, 588 [122 P.2d 96].) The reasons for the rule are clear: "It is well established that the courts are reluctant to order a change of custody and will not do so except for imperative reasons; that it is desirable that there be an end of litigation

*Equal Protection Clause* (1975) 15 Santa Clara Law. 855; Comment, *The Equal Protection and Due Process Clauses: Two Means of Implementing "Integrationism" for Handicapped Applicants for Public Employment* (1978) 27 DePaul L.Rev. 1169; Note, *Abroad in the Land: Legal Strategies to Effectuate the Rights of the Physically Disabled* (1973) 61 Geo.L.J. 1501.) In the view we take of the case we need not reach the constitutional issues at this time.

William further complains that the trial court erred in declining several offers of evidence of alleged misconduct of Ellen occurring at various times prior to the hearing. We have reviewed the relevant portions of the record and conclude that certain of the offers were properly refused because the evidence in question was too remote (*Prouty* v. *Prouty* (1940) 16 Cal.2d 190, 194 [105 P.2d 295]), while others should probably have been accepted but failure to do so could not have resulted in prejudice (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]).

and undesirable to change the child's established mode of living." (*Connolly* v. *Connolly* (1963) 214 Cal.App.2d 433, 436 [29 Cal.Rptr. 616], and cases cited.)[4]

■ Moreover, although a request for a change of custody is also addressed in the first instance to the sound discretion of the trial judge, he must exercise that discretion in light of the important policy considerations just mentioned. For this reason appellate courts have been less reluctant to find an abuse of discretion when custody is changed than when it is originally awarded, and reversals of such orders have not been uncommon. (E.g., *In re Marriage of Kern* (1978) 87 Cal.App.3d 402, 410-411 [150 Cal.Rptr. 860]; *In re Marriage of Russo* (1971) 21 Cal.App.3d 72 [98 Cal.Rptr. 501]; *Denham* v. *Martina* (1963) 214 Cal.App.2d 312 [29 Cal.Rptr. 377]; *Ashwell* v. *Ashwell* (1955) 135 Cal.App.2d 211 [286 P.2d 983]; *Sorrels* v. *Sorrels* (1951) 105 Cal.App.2d 465 [234 P.2d 103]; *Bemis* v. *Bemis* (1948) 89 Cal.App.2d 80 [200 P.2d 84]; *Juri* v. *Juri* (1945) 69 Cal.App.2d 773 [160 P.2d 73]; *Washburn* v. *Washburn* (1942) *supra,* 49 Cal.App.2d 581.)

Finally, the burden of showing a sufficient change in circumstances is on the party seeking the change of custody. (*Prouty* v. *Prouty* (1940) *supra,* 16 Cal.2d 190, 193; *In re Marriage of Kern* (1978) *supra,* 87 Cal.App.3d 402, 410-411; *In re Marriage of Mehlmauer* (1976) 60 Cal.App.3d 104, 108-109 [131 Cal.Rptr. 325].) In attempting to carry that burden Ellen relied on several items of testimony given at the hearing; even when these circumstances are viewed in their totality, however, they are insufficient for the purpose.

First, Ellen showed that although she had been unemployed when William was given custody in 1972, at the time of trial she had a job as a medical records clerk in a New York hospital. But her gross income from that job was barely $500 per month, and she admitted she would not be able to support the boys without substantial financial assistance from William. (See fn. 2, *ante.*) By contrast, at the time of the hearing

[4]Ellen relies on *Loudermilk* v. *Loudermilk* (1962) 208 Cal.App.2d 705, 707-708 [25 Cal.Rptr. 434], which held that the foregoing rule is "not applicable" when custody was originally awarded pursuant to an agreement between the parties rather than a judicial decree. But the opinion gave scant authority for this asserted exception, and it has since been cited only once in dictum. It is also wrong in principle: regardless of how custody was originally decided upon, after the child has lived in one parent's home for a significant period it surely remains "undesirable" to uproot him from his "established mode of living," and a substantial change in his circumstances should ordinarily be required to justify that result. To the extent it declares a contrary rule, *Loudermilk* is disapproved.

William's monthly income from a combination of veteran's disability compensation payments and social security benefits had risen to more than $1,750 per month, all tax-free.

Ellen next pointed to the fact that William's relationship with Lori might be in the process of terminating.[5] From this evidence Ellen argued that if Lori were to leave, William would have to hire a baby-sitter to take care of the children. On cross-examination, however, Ellen admitted that if custody were transferred to her she would likewise be compelled because of her job to place the children "in a child care center under a baby-sitter nine hours a day," and she intended to do so. During that period, of course, the children would not be under her supervision; by contrast, William explained that because he is not employed he is able to remain at home "to see to their upbringing during the day as well as the night."

Additional claims lacked support in the record. Thus Ellen impliedly criticized William's living arrangements for the boys, and testified that if she were given custody she intended to move out of her one-bedroom apartment into an apartment with "at least" two bedrooms. Yet it was undisputed that the boys were presently residing in a private house containing in effect four bedrooms, with a large living room and a spacious enclosed back yard; despite additional residents, there was no showing that the accommodations were inadequate for the family's needs. Ellen further stated that in her opinion the older boy should be seen by a dentist; there was no expert testimony to this effect, however, and no evidence that the child was not receiving normal dental care. She also remarked that the younger boy seemed to have a problem with wetting his bed but had not been taken to a doctor about it; again there was no evidence that medical intervention in this matter was either necessary or desirable. We obviously cannot take judicial notice of the cause of, or currently recommended cure for, childhood enuresis.[6]

[5]Lori candidly testified she had been "thinking about" leaving. She added, however, that "Bill and I have had some problems, just like anyone else in our situation would have, and we are going to get counseling, and hopefully that will settle the matters." And she declared that she loved both of the boys and wanted to continue being their "substitute mother."

[6]In the only testimony on the point Ellen reported that William's cousin, who had been living with the family explained to her the reason the boy wet the bed is "because he wears himself out so much playing that he just doesn't get up at night."

Ellen advanced other grounds for a change of custody that are even more insubstantial. Thus she claimed she wanted to enroll the boys in "some kind of church"—a choice of words scarcely indicative of a deep religious commitment on her part. And she complained that because William had moved several times in the past five years the boys

In short, if the trial court had based its change of custody order on the foregoing circumstances alone, it would in effect have revived the "mother's preference" rule abrogated by the Legislature in 1972. The record discloses, however, that the court gave great weight to another factor—William's physical handicap and its presumed adverse effect on his capacity to be a good father to the boys. Whether that factor will support the reliance placed upon it is a difficult question to which we now turn.

Ellen first raised the issue in her declaration accompanying her request for a change of custody, asserting that because of William's handicap "it is almost impossible for [him] to actually care for the minor children," and "since [he] is confined to a hospital bed, he is never with the minor children and thus can no longer effectively care for the minor children or see to their physical and emotional needs." When asked at the hearing why she believed she should be given custody, she replied inter alia, "Bill's physical condition." Thereafter she testified that according to her observations William is not capable of feeding himself or helping the boys prepare meals or get dressed; and she summed up by agreeing that he is not able to do "anything" for himself.

The trial judge echoed this line of reasoning throughout the proceedings. Virtually the only questions he asked of any witness revolved around William's handicap and its physical consequences, real or imagined. Thus although William testified at length about his present family life and his future plans, the judge inquired only where he sat when he got out of his wheelchair, whether he had lost the use of his arms, and what his medical prognosis was. Again, when Lori took the stand and testified to William's good relationship with his boys and their various activities together, the judge interrupted to ask her in detail whether it was true that she had to bathe, dress, undress, cook for and feed William. Indeed, he seemed interested in little else.

The final witness was Dr. Jack Share, a licensed clinical psychologist specializing in child development, who had visited William's home and studied his family.[7] Dr. Share testified that William had an IQ of 127, was a man of superior intelligence, excellent judgment and ability to plan,

had not had a chance to "get established" in a school or neighborhood—a strange objection coming from one who proposed to move them 3,000 miles. In any event, the record indicated that most of William's moves were job-related and took place prior to the date of his injury, and hence were irrelevant to the family's present situation.

[7] Dr. Share is also a credentialed schoolteacher and a licensed marriage counselor.

and had adapted well to his handicap. He observed good interaction between William and his boys, and described the latter as self-disciplined, sociable, and outgoing. On the basis of his tests and observations, Dr. Share gave as his professional opinion that neither of the children appeared threatened by William's physical condition; the condition did not in any way hinder William's ability to be a father to them, and would not be a detriment to them if they remained in his home; the present family situation in his home was a healthy environment for the children; and even if Lori were to leave, William could still fulfill his functions as father with appropriate domestic help.

Ellen made no effort on cross-examination to dispute any of the foregoing observations or conclusions, and offered no expert testimony to the contrary. The judge then took up the questioning, however, and focused on what appears to have been one of his main concerns in the case—i.e., that because of the handicap William would not be able to participate with his sons in sports and other physical activities. Thus the court asked Dr. Share, "It's very unfortunate that he's in this condition, but when these boys get another two, three years older, would it be better, in your opinion, if they had a parent that was able to actively go places with them, take them places, play Little League baseball, go fishing? Wouldn't that be advantageous to two young boys?" Dr. Share replied that "the commitment, the long-range planning, the dedication" of William to his sons were more important, and stated that from his observations William was "the more consistent, stable part of this family regardless of his physical condition at this point." The judge nevertheless persisted in stressing that William "is limited in what he can do for the boys," and demanded an answer to his question as to "the other activities that two growing boys should have with a natural parent." Dr. Share acknowledged William's obvious physical limitations, but once more asserted that "On the side dealing with what I have called the stability of the youngsters, which I put personally higher value on, I would say the father is very strong in this area." Finally, when asked on redirect examination what effect William's ability to drive will have, Dr. Share explained, "this opens up more vistas, greater alternatives when he's more mobile such as having his own van to take them places. . . ."

We need not speculate on the reasons for the judge's ensuing decision to order the change of custody, as he candidly stated them for the record. First he distinguished a case cited by William, emphasizing "There was no father there or mother that was unable to care for the children because of physical disabilities. . . ." Next he found William and Ellen to be

"both good, loving parents," although he strongly chided the latter for failing to visit her sons for five years, saying "She should have crawled on her hands and knees out here if she had to to get the children. . . ." The judge then returned to the theme of William's physical inability to personally take care of the children: speculating on Lori's departure, the judge stressed that in such event "a housekeeper or a nursery" would have to be hired—overlooking the admitted fact that Ellen would be compelled to do exactly the same herself for nine hours a day. And he further assumed "There would have to be pick up and probably delivery of the children even though [William] drives his van"—a non sequitur revealing his misunderstanding of the purpose and capabilities of that vehicle.

More importantly, the judge conceded that Dr. Share "saw a nice, loving relationship, and that's absolutely true. There's a great relationship between [William] and the boys. . . ." Yet despite this relationship the judge concluded "I think it would be detrimental to the boys to grow up until age 18 in the custody of their father. *It wouldn't be a normal relationship between father and boys.*" And what he meant by "normal" was quickly revealed: "It's unfortunate [William] has to have help bathing and dressing and undressing. *He can't do anything for the boys himself except maybe talk to them and teach them, be a tutor, which is good, but it's not enough.* I feel that it's in the best interests of the two boys to be with the mother even though she hasn't had them for five years." (Italics added.)

Such a record approaches perilously close to the showing in *Adoption of Richardson* (1967) *supra*, 251 Cal.App.2d 222. There the trial court denied a petition to adopt an infant boy because of the physical handicap of the proposed adoptive parents, who were deaf-mutes. As here, professional opinions were introduced—and remained uncontradicted—stating that the petitioners had adjusted well to their handicap and had a good relationship with the child, and that their disability would have no adverse effects on his physical or emotional development. Nevertheless, in language strangely similar to that of the judge herein, the trial court reasoned: " 'Is this a normally happy home? There is no question about it, it is a happy home, but is it a normal home? I don't think the Court could make a finding that it is a normal home when these poor unfortunate people, they are handicapped, and what can they do in the way of bringing this child up to be the type of citizen we all want him to be.' " (*Id.*, at p. 228.) The Court of Appeal there concluded from this and other evidence that the trial judge was prejudiced by a belief that no

deaf-mute could ever be a good parent to a "normal" child. While recognizing the rule that the granting or denial of a petition for adoption rests in the discretion of the judge, the appellate court held that such discretion had been abused and accordingly reversed the judgment. (*Id.*, at p. 237.)

While it is clear the judge herein did not have the totally closed mind exhibited in *Richardson,* it is equally plain that his judgment was affected by serious misconceptions as to the importance of the involvement of parents in the purely physical aspects of their children's lives. We do not mean, of course, that the health or physical condition of the parents may not be taken into account in determining whose custody would best serve the child's interests. In relation to the issues at stake, however, this factor is ordinarily of minor importance; and whenever it is raised—whether in awarding custody originally or changing it later—it is essential that the court weigh the matter with an informed and open mind.

In particular, if a person has a physical handicap it is impermissible for the court simply to rely on that condition as prima facie evidence of the person's unfitness as a parent or of probable detriment to the child; rather, in all cases the court must view the handicapped person as an individual and the family as a whole. To achieve this, the court should inquire into the person's actual and potential physical capabilities, learn how he or she has adapted to the disability and manages its problems, consider how the other members of the household have adjusted thereto, and take into account the special contributions the person may make to the family despite—or even because of—the handicap. Weighing these and all other relevant factors together, the court should then carefully determine whether the parent's condition will in fact have a substantial and lasting adverse effect on the best interests of the child.[8]

The record shows the contrary occurred in the case at bar. To begin with, the court's belief that there could be no "normal relationship between father and boys" unless William engaged in vigorous sporting activities with his sons is a further example of the conventional sex-stereotypical thinking that we condemned in another context in

---

[8]A recent statute makes the point in a closely related context: a child may be made a ward of the court because of lack of parental care and control, but "No parent shall be found to be incapable of exercising proper and effective parental care or control solely because of a physical disability. . . ." (Welf. & Inst. Code, § 300, subd. (a); see, e.g., *In re W. O.* (1979) 88 Cal.App.3d 906, 910 [152 Cal.Rptr. 130] [mother's epilepsy no ground for removing children from her custody].)

*Sail'er Inn* v. *Kirby* (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]. For some, the court's emphasis on the importance of a father's "playing baseball" or "going fishing" with his sons may evoke nostalgic memories of a Norman Rockwell cover on the old Saturday Evening Post. But it has at last been understood that a boy need not prove his masculinity on the playing fields of Eton, nor must a man compete with his son in athletics in order to be a good father: their relationship is no less "normal" if it is built on shared experiences in such fields of interest as science, music, arts and crafts, history or travel, or in pursuing such classic hobbies as stamp or coin collecting. In short, an afternoon that a father and son spend together at a museum or the zoo is surely no less enriching than an equivalent amount of time spent catching either balls or fish.[9]

Even more damaging is the fact that the court's preconception herein, wholly apart from its outdated presumption of proper gender roles, also stereotypes William as a person deemed forever unable to be a good parent simply because he is physically handicapped. Like most stereotypes, this is both false and demeaning. On one level it is false because it assumes that William will never make any significant recovery from his disability. There was no evidence whatever to this effect. On the contrary, it did appear that the hearing was being held only one year after the accident, that William had not yet begun the process of rehabilitation in a home environment, and that he was still a young man in his twenties. In these circumstances the court could not presume that modern medicine, helped by time, patience, and determination, would be powerless to restore at least some of William's former capabilities for active life.

Even if William's prognosis were poor, however, the stereotype indulged in by the court is false for an additional reason: it mistakenly assumes that the parent's handicap inevitably handicaps the child. But children are more adaptable than the court gives them credit for; if one path to their enjoyment of physical activities is closed, they will soon find another. Indeed, having a handicapped parent often stimulates the growth of a child's imagination, independence, and self-reliance. Today's urban youngster, moreover, has many more opportunities for formal and informal instruction than his isolated rural predecessor. It is true that William may not be able to play tennis or swim, ride a bicycle or do

---

[9]The sex stereotype, of course, cuts both ways. If the trial court's approach herein were to prevail, in the next case a divorced mother who became physically handicapped could be deprived of her young daughters because she is unable to participate with them in embroidery, *haute cuisine*, or the fine arts of washing and ironing. To state the proposition is to refute it.

gymnastics; but it does not follow that his children cannot learn and enjoy such skills, with the guidance not only of family and friends but also the professional instructors available through schools, church groups, playgrounds, camps, the Red Cross, the YMCA, the Boy Scouts, and numerous service organizations. As Dr. Share pointed out in his testimony, ample community resources now supplement the home in these circumstances.

In addition, it is erroneous to presume that a parent in a wheelchair cannot share to a meaningful degree in the physical activities of his child, should both desire it. On the one hand, modern technology has made the handicapped increasingly mobile, as demonstrated by William's purchase of a van and his plans to drive it by means of hand controls. In the past decade the widespread availability of such vans, together with sophisticated and reliable wheelchair lifts and driving control systems, have brought about a quiet revolution in the mobility of the severely handicapped. No longer are they confined to home or institution, unable to travel except by special vehicle or with the assistance of others; today such persons use the streets and highways in ever-growing numbers for both business and pleasure. Again as Dr. Share explained, the capacity to drive such a vehicle "opens more vistas, greater alternatives" for the handicapped person.

At the same time the physically handicapped have made the public more aware of the many unnecessary obstacles to their participation in community life. Among the evidence of the public's change in attitude is a growing body of legislation intended to reduce or eliminate the physical impediments to that participation, i.e., the "architectural barriers" against access by the handicapped to buildings, facilities, and transportation systems used by the public at large. (See, e.g., Gov. Code, § 4450 et seq. [requires handicapped access to buildings and facilities constructed with public funds]; Health & Saf. Code, § 19955 et seq. [access to private buildings open to the general public]; Gov. Code, § 4500 [access to public transit systems]; Pub. Resources Code, § 5070.5, subd. (c) [access to public recreational trails]; see also Veh. Code, §§ 22507.8, 22511.5 et seq. [special parking privileges for handicapped drivers].)[10]

[10]Similar legislation has been enacted on the federal level. (See, e.g., Architectural Barriers Act of 1968 (42 U.S.C. §§ 4151-4157) [requires handicapped access to public buildings constructed, leased, or financed by the federal government]; Rehabilitation Act of 1973, § 502 (29 U.S.C. § 792) [creates Architectural and Transportation Barriers Compliance Board to ensure compliance with Architectural Barriers Act and promote removal of "architectural, transportation, and attitudinal barriers confronting handicapped individuals"]; Urban Mass Transportation Assistance Act of 1970, § 8 (49 U.S.C.

While there is obviously much room for continued progress in removing these barriers, the handicapped person today need not remain a shut-in. Although William cannot actually play on his children's baseball team, he may nevertheless be able to take them to the game, participate as a fan, a coach, or even an umpire—and treat them to ice cream on the way home. Nor is this companionship limited to athletic events: such a parent is no less capable of accompanying his children to theaters or libraries, shops or restaurants, schools or churches, afternoon picnics or long vacation trips. Thus it is not true that, as the court herein assumed, William will be unable "to actively go places with [his children], take them places, . . ."

On a deeper level, finally, the stereotype is false because it fails to reach the heart of the parent-child relationship. Contemporary psychology confirms what wise families have perhaps always known— that the essence of parenting is not to be found in the harried rounds of daily carpooling endemic to modern suburban life, or even in the doggedly dutiful acts of "togetherness" committed every weekend by well-meaning fathers and mothers across America. Rather, its essence lies in the ethical, emotional, and intellectual guidance the parent gives to the child throughout his formative years, and often beyond. The source of this guidance is the adult's own experience of life; its motive power is parental love and concern for the child's well-being; and its teachings deal with such fundamental matters as the child's feelings about himself, his relationships with others, his system of values, his standards of conduct, and his goals and priorities in life. Even if it were true, as the court herein asserted, that William cannot do "anything" for his sons except "talk to them and teach them, be a tutor," that would not only be "enough"—contrary to the court's conclusion—it would be the most valuable service a parent can render. Yet his capacity to do so is entirely unrelated to his physical prowess: however limited his bodily strength may be, a handicapped parent is a whole person to the child who needs his affection, sympathy, and wisdom to deal with the problems of growing up. Indeed, in such matters his handicap may well be an asset: few can pass through the crucible of a severe physical disability without learning enduring lessons in patience and tolerance.

No expert testimony was necessary to establish these facts. As the Court of Appeal correctly observed in a somewhat different context, "It

§ 1612) [declares federal policy that mass transit systems be designed for access by handicapped]; see also 49 C.F.R. pt. 609 (1978) [regulations concerning access to mass transit systems receiving federal financial assistance.].)

requires no detailed discussion to demonstrate that the support and, even more, the control of the child is primarily a mental function to which soundness of mind is a crucial prerequisite. It is also well known that physical handicaps generally have no adverse effect upon mental functions. . . . It is also a matter of common knowledge that many persons with physical handicaps have demonstrated their ability to adequately support and control their children and to give them the benefits of stability and security through love and attention." (*In re Eugene W.* (1972) 29 Cal.App.3d 623, 629-630 [105 Cal.Rptr. 736].)

■ We agree, and conclude that a physical handicap that affects a parent's ability to participate with his children in purely physical activities is not a changed circumstance of sufficient relevance and materiality to render it either "essential or expedient" for their welfare that they be taken from his custody. This conclusion would be obvious if the handicap were heart dysfunction, emphysema, arthritis, hernia, or slipped disc; it should be no less obvious when it is the natural consequence of an impaired nervous system. ■ Accordingly, pursuant to the authorities cited above the order changing the custody of the minor children herein from William to Ellen must be set aside as an abuse of discretion.

Both the state and federal governments now pursue the commendable goal of total integration of handicapped persons into the mainstream of society: the Legislature declares that "It is the policy of this state to encourage and enable disabled persons to participate fully in the social and economic life of the state. . . ." (Gov. Code, § 19230, subd. (a).) Thus far these efforts have focused primarily on such critical areas as employment, housing, education, transportation, and public access. (See, e.g., Welf. & Inst. Code, § 19000 [declares policy of rehabilitation for employment]; Gov. Code, § 11135 [bars discrimination against handicapped in state-funded programs]; *id.*, § 19230 et seq. [requires affirmative action programs for handicapped employment by state agencies]; *id.*, § 19702 [bars discrimination in state civil service]; Lab. Code, § 1420 [bars discrimination by private employers or labor unions]; *id.*, § 1735 [bars discrimination in employment on public works]; Civ. Code, §§ 54, 54.1 [guarantees access to public transportation, public accommodations, and rented housing]; Ed. Code, § 56700 et seq. [creates special educational programs for physically handicapped students]; Bus. & Prof. Code, 125.6 [bars discrimination by holders of professional licenses]; Code v. Proc., §§ 198, subd. 2, 205, subd. (b) [declares handicapped

competent to serve as jurors].)[11] No less important to this policy is the integration of the handicapped into the responsibilities and satisfactions of family life, cornerstone of our social system. Yet as more and more physically disabled persons marry and bear or adopt children—or, as in the case at bar, previously nonhandicapped parents become disabled through accident or illness—custody disputes similar to that now before us may well recur. In discharging their admittedly difficult duty in such proceedings, the trial courts must avoid impairing or defeating the foregoing public policy. With the assistance of the considerations discussed herein, we are confident of their ability to do so.

Lastly, we recognize that during the pendency of this appeal, additional circumstances bearing on the best interests of the children herein may have developed. Any such circumstances may, of course, be considered by the trial court on remand. (See *In re Marriage of Russo* (1971) *supra,* 21 Cal.App.3d 72, 93-94.)

The portion of the interlocutory decree of dissolution transferring custody of appellant's minor children to respondent is reversed.

Bird, C. J., Tobriner, J., Clark, J., Richardson, J., Manuel, J., and Newman, J., concurred.

---

[11]Again Congress has enacted similar legislation. (See, e.g., 5 U.S.C. § 7153 [authorizes rules to prohibit discrimination against handicapped by federal agencies and federal civil service]; 20 U.S.C. § 1401 et seq. [promotes education of handicapped children]; Rehabilitation Act of 1973, § 501 (29 U.S.C. § 791) [requires affirmative action programs by federal agencies]; *id.,* § 503 (29 U.S.C. § 793) [requires affirmative action programs by employers who contract with federal government]; *id.,* § 504 (29 U.S.C. § 794) [bars discrimination against handicapped in federally funded programs]; see also 45 C.F.R. pt. 84 (1978) [regulations implementing 29 U.S.C. § 794].)

On these and related topics, see generally *Symposium on Employment Rights of the Handicapped* (1978) 27 DePaul L.Rev. 943-1167; *Symposium on the Rights of the Handicapped* (1977) 50 Temple L.Q. 941-1034, 1067-1085; Jackson, *Affirmative Action for the Handicapped and Veterans: Interpretative and Operational Guidelines* (1978) 29 Lab.L.J. 107.