199 Cal.App.3d 183 (1988)
244 Cal. Rptr. 490
In re ANNE P., a Person Coming Under the Juvenile Court Law.
PEDRO R. SILVA, as Chief Probation Officer, etc., Plaintiff and Respondent,
v.
FRANK P., Defendant and Appellant.
Docket No. H002617.
Court of Appeals of California, Sixth District.
February 5, 1988.
*186 COUNSEL
Dolly Ares for Defendant and Appellant.
Donald L. Clark, County Counsel, and Jamie Jacobs-May, Deputy County Counsel, for Plaintiff and Respondent.
OPINION
STONE (P.G.), J.[*]
Frank P. appeals from a juvenile court order declaring his five-year-old daughter Anne a dependent of the juvenile court and ordering that she be placed in the home of her natural mother, Joan C., under the supervision of the Social Services Department. (Welf. & Inst. Code, § 300, subd. (a).)[1] On appeal, father contends that the juvenile court had no jurisdiction to make this order because the superior court had primary and continuing jurisdiction over custody of the minor. In addition, father contends that even if the juvenile court did have jurisdiction over the matter, father was not given adequate notice of the ground on which the juvenile court ultimately exercised jurisdiction under section 300, subdivision *187 (a). Finally, father contends the evidence was insufficient to support the court's order of dependency. We affirm.

FACTS
This case represents the latest chapter in the long struggle between Frank P. (father) and his former wife, Joan C. (mother), to gain control and custody of their daughter Anne.
Anne was born on June 14, 1981, about one year after her parents were married. The marriage withered, and in April of 1983 father filed a petition for dissolution of marriage. In March of 1984, an interlocutory judgment of dissolution was filed giving both parents joint legal and physical custody of Anne. The interlocutory judgment provided that Anne would spend two weeks with each parent on a rotating basis.

A. The Custody Trial In Superior Court
After the divorce became final, mother moved to Southern California while father remained in Santa Clara County. Consequently, because of the joint custody order, Anne was required to travel between Southern California and San Jose every two weeks.
After she moved to Southern California, mother noticed increasing behavioral problems with Anne and brought her to a child psychologist who recommended a change in the custody arrangement to alleviate the child's "stress reaction" to being shuttled between San Jose and Southern California. At about this time, mother also began to suspect that father was sexually molesting Anne.
In November of 1984, mother filed a motion for change of custody in the superior court. By the time trial on this matter commenced in March of 1985, both parents were seeking sole physical custody of Anne due to a variety of alleged changed circumstances. For her part, mother alleged that father had: (1) sexually molested Anne; (2) used cocaine in her presence and caused her to ingest cocaine; (3) exposed Anne to improper photos of male genitalia; (4) had exposed himself to the child; and (5) took improper nude photos of the child and himself. Father's request for sole custody was based on, inter alia, mother's interference with his custody and visitation rights, the false accusations against him, and mother's alleged mental imbalance. The minor was represented by counsel at the custody trial.
*188 Following 19 days of trial, Judge Charles Gordon found that mother's charges against father were completely unfounded. Judge Gordon went beyond merely finding that mother had not carried her burden to prove the allegations; he also stated that he was convinced father was "totally innocent" of the charges made by mother.[2] Moreover, Judge Gordon found that "whether [mother] acted consciously and deliberately to harm [father] or was subconsciously motivated by angry and aggressive feelings toward him ... the effect has been to cause great and unnecessary pain, hardships and disruption to the lives of many people, including the very person [mother] intended to protect [namely, Anne]."
In fashioning an appropriate custody order, Judge Gordon considered mother's destructive conduct and the child's need for stability and a sense of family. Based primarily on these considerations, Judge Gordon awarded sole custody to the father, subject to mother's reasonable visitation rights, which amounted to one weekend each month plus specified holidays. As an express condition of her visitation rights, mother was required to undergo a program of psychological counseling. Mother appealed from Judge Gordon's order, and this appeal is pending in this court.

B. Events Following The Custody Trial
About a year after mother lost the custody fight for her daughter, mother noticed an unusual redness in Anne's genital area during one of her regular visits. Again suspecting that her daughter was being molested, mother contacted Ann Steiner of the Child Advocacy Center. Ms. Steiner brought the case to the attention of the Santa Clara Juvenile Probation Department, and the matter was eventually assigned to Mary Pat Panighetti of that department.
Ms. Panighetti interviewed Anne on March 30, 1986, when she was visiting mother. Using drawings and anatomically correct dolls, Ms. Panighetti *189 questioned Anne concerning how father had touched her. According to Anne, her father had touched her "girl part" (vagina) with his "boy part" (penis). This incident apparently occurred before Judge Gordon issued his order in the custody trial. Ms. Panighetti then asked Anne what she would like to see changed in her life. She responded that she "didn't want this to happen again" and wanted to live with her mother.
Anne was placed into protective custody later on the day of the interview and the next day was examined by a physician. The examination uncovered no evidence of injury to Anne's vagina.

C. The Juvenile Court Action
Two days after Anne was interviewed  April 1, 1986  the Santa Clara County Probation Department filed two petitions in the juvenile court requesting that Anne be made a dependent of that court. The first petition was filed pursuant to section 300, subdivision (d)[3] and alleged that "during the two years last past said minor was sexually molested by her natural father while residing in the family home; therefore, said minor, ANNE [P.], resides within a home which is an unfit place for her by reason of depravity." The second petition was filed pursuant to section 300, subdivision (a)[4] and alleged that "during the two years last past said minor was sexually molested while residing in the home of her natural father; and furthermore, said minor's mother is unable to protect or care for said minor due to existing Family Court orders; and furthermore, said minor is subjected to extreme family conflict due to the ongoing battle between said minor's natural parents over said minor's custody; therefore, said minor, ANNE [P.], has no parent or guardian actually exercising proper and effective parental care and control and said minor is in need of such care and control."
A third petition  the one on which (with some modification) the case was eventually tried  was filed in the juvenile court on August 11, 1986. This petition was also filed pursuant to section 300, subdivision (a), and alleged that the minor "states and believes that she has been sexually molested by her natural father; further, said minor has suffered psychological harm as a direct result of interaction with one or both of her natural parents *190 and her parents have been unable to provide for the psychological well being of the minor; further, because the minor has special needs due to the family dynamics, the minor requires the assistance, protection, and services of the Juvenile Court; therefore, said minor, ANNE [P.], has no parent or guardian actually exercising proper and effective parental care and control and said minor is in need of such care and control."

(1) The Motion To Dismiss
Prior to trial, father moved to dismiss the petitions filed in the juvenile court on the ground that the superior court had already decided the molestation allegations and had continuing jurisdiction over this issue as it affected Anne's custody. Since the petitions alleged the same conduct which had been the subject of litigation in the superior court, father argued that the juvenile court lacked jurisdiction to entertain the petitions.
The juvenile court judge  Judge Premo  found that although he did not have jurisdiction to rule on the allegations of molestation already litigated by the superior court, he did have jurisdiction to decide those parts of the section 300, subdivision (a) petitions which alleged that, due to the ongoing conflict between the parents, the child had become so disturbed that juvenile court intervention was required. In Judge Premo's view, the effect of the continuing parental conflict on Anne's then-present psychological state was an issue which had not been litigated by the superior court and was a proper subject of the juvenile court action. Consequently, Judge Premo denied the motion to dismiss, but ordered trial counsel to limit the evidence presented to that which had a bearing on Anne's present emotional state.

(2) Evidence At The Jurisdictional Phase
Due to Judge Premo's limiting order, the evidence presented at the jurisdictional phase of the hearing focused on Anne's emotional state. Judge Premo viewed a videotaped interview between Anne and a court-appointed psychiatrist. Apparently, Anne appeared distraught and unhappy during the interview.
Mary Panighetti  the probation officer assigned to the case  also testified. She first related the facts concerning her initial investigation (see FACTS, pt. B, ante, p. 188). In addition, based on repeated contact with Anne and others involved in her care, she testified that Anne was "conflicted, confused, suffering a sense of loss, depression" and had "tremendous unmet needs."
*191 Evidence from several sources indicated that Anne had also developed a near pathological fear of men. Helen Linsley  who had been Anne's foster mother since she had been taken into protective custody on March 30  testified that when Anne first met her husband, she panicked and retreated to her bedroom and did not want to come out. When Ms. Linsley's grown sons came to visit, Anne retreated to her bedroom and refused to come out, telling Ms. Linsley: "I dont's want to come out, there is men." Anne also expressed fear of other men, including a male social worker and her own attorney.
Ms. Linsley  who had cared for over 450 children during her 22 years as a foster parent  believed that Anne was one of the more emotionally disturbed children she had cared for. In Ms. Linsley's view, Anne was in danger of losing complete control and "going off the deep end."
The parents' inability to cope with Anne's problems is perhaps best illustrated by their failure to reach even a temporary arrangement concerning Anne's custody pending trial. Several days into trial, it became clear to Judge Premo and the parties that Anne was severely depressed and desperately needed more contact with her parents. Consequently, Judge Premo ordered the parties and their attorneys to meet to try to work out a temporary agreement which would allow Anne more contact with her parents and less time in the foster home. Father was absent from the first meeting and no agreement was reached. Believing that father's input was necessary to reach an agreement, Judge Premo ordered that he meet with the mother to try to work out an agreement. Father did agree to meet with mother and her attorney, but arrived at the meeting with his new wife and 22-month-old son. Mother refused to meet with father if father's new wife were present. Father then refused to participate in any further discussions because he believed they would not be in good faith. Consequently, Anne was forced to remain in the foster home during the entire jurisdictional hearing.
After hearing additional testimony from both mother and father, the court concluded that, with the exception of the first sentence, the allegations in the August 11 section 300, subdivision (a) petition had been proved. Specifically, relying on the August 11 petition, the court found "that the minor comes within the provisions of section 300([a]) of the juvenile court law in that said minor has suffered psychological harm as a direct result of interaction with one or both of her natural parents and her parents have been unable to provide for the psychological well being of the minor; further, because the minor has special needs due to the family dynamics the minor requires the assistance, protection and services of the juvenile court, *192 therefore, said minor Anne [P.] has no parent or guardian actually exercising effective parental care and control, and said minor is in need of such care and control." At the dispositional hearing, the court further elaborated on its reasons for making the child a dependent of the juvenile court: "The reasons for my decision again to make the child a ward is that the evidence reflects basically an undisputed, undisputed condition or state, that the child has a severe psychological disturbance at this time. [¶] In my judgment the disturbance is caused basically by the ongoing and unrelenting struggle between the mother, the natural mother and natural father. [¶] Neither parent for whatever personality deficiencies they have are able to break off that struggle or to lessen its intensity in any way. [¶] As a consequence the contest between them continues in the form of custody disputes, allegations of child molestation which causes investigations, there being several in the past where police departments have investigated and so forth, and one here where the probation department has investigated. [¶] Neither parent shows any ability in a practical sense to alter the course of that, this atmosphere. Both parents demonstrate in court at this time a kind of strange reaction and effect to the situation they find themselves in. [¶] [] And since in my judgment her psychological condition is caused by the parents, and the parents are not able to do anything to stop what is going on, then it seems to be crystal clear that the court has to intervene, and those are the reasons for the 300 decision."
Since Judge Premo determined juvenile court intervention was appropriate on the grounds related above, he did not make any findings regarding the allegations of sexual molestation or Anne's belief that she had been sexually molested. Consequently, the court dismissed the first sentence of the August 11 section 300, subdivision (a) petition  which alleged that the minor believed she was sexually molested  and the whole of the other two petitions.

(3) Dispositional Phase
After Judge Premo made his jurisdictional finding, father informed the court that he would not participate in the dispositional phase of the trial. Father decided not to participate because, in his words, it would be in Anne's best interests if he were to "magnanimously step back." Nevertheless, believing that his participation was important, Judge Premo ordered father to be present at the dispositional hearing. Despite this order, father did not appear at the hearing, although his attorney did.
The dispositional probation report recommended that the child be removed from the custody of the father and that she be committed to the care *193 and control of the probation officer for placement, with placement in the mother's home approved. The attorneys for the probation department, mother, and minor concurred with this recommendation. Judge Premo followed the probation report recommendation and ordered that Anne be committed to the care, custody, and control of the probation officer for placement in the mother's home. Judge Premo also ordered, inter alia, that father was to have visitation and contact with Anne as deemed appropriate by the supervising social worker.
Father has appealed from the juvenile court's jurisdictional and dispositional orders.

DISCUSSION

A. The Superior Court's Custody Order Did Not Preempt Juvenile Court Jurisdiction
(1a) Relying primarily on In re Brendan P. (1986) 184 Cal. App.3d 910 [230 Cal. Rptr. 720], father contends that the superior court had continuing jurisdiction regarding the matters later litigated in the juvenile court, and that the superior court's primary and continuing jurisdiction preempted the juvenile court's exercise of jurisdiction in this case. We disagree.
The cases which deal with the conflict between family court and juvenile court custody orders are admittedly confusing and difficult to reconcile. Consequently, in undertaking our analysis, we begin with long-accepted principles and then go on to discuss the more recent case law.
(2a) It has long been established that a superior court order awarding custody of minor children in a divorce action does not, in itself, deprive the juvenile court of jurisdiction to later litigate matters and issue orders affecting the custody of those children. (Dupes v. Superior Court (1917) 176 Cal. 440, 441-442 [168 P. 888]; Svoboda v. Superior Court (1923) 190 Cal. 727, 731-732 [214 P. 440]; In re Brendan P., supra, 184 Cal. App.3d at p. 917; In re William T. (1985) 172 Cal. App.3d 790, 797-798 [218 Cal. Rptr. 420]; In re Farley (1958) 162 Cal. App.2d 474, 478-479 [328 P.2d 230]; Marr v. Superior Court (1952) 114 Cal. App.2d 527, 531-532 [250 P.2d 739]; In re Holt (1953) 121 Cal. App.2d 276, 278 [263 P.2d 50].) Moreover, "when a juvenile court has adjudged an infant to be its ward then the orders of that court concerning the physical custody, control and care of its ward supersede for as long as necessary any existing orders of other courts made in custodial matters which conflict therewith...." (Marr v. Superior Court, *194 supra, 114 Cal. App.2d at p. 531; see also In re William T., supra, 172 Cal. App.3d at p. 797.) The policy behind this rule was recently articulated by the Fifth Appellate District: "The state, acting through the juvenile court under the theory of parens patriae, seeks to protect the child or the community. In dependency proceedings, a private party does not invoke jurisdiction of the juvenile court. A probation officer or social worker, through the services of child abuse or child protective agencies, determines whether proceedings in the juvenile court are warranted, and the filing of a petition is preceded by an investigation to determine if there is cause to commence such proceedings. [Citation.] These processes insulate the proceedings from self-interest and petty interferences which can pervade parental custody disputes. The child's welfare is paramount; the child is a party to the action and must be represented by counsel. [Citation.] In most parental custody proceedings, the child is not ensured representation and must depend upon others to represent the child's `best interests.' [Citations.] [Moreover,] [t]he circumstances under which the child may be declared a dependent are specifically embodied in the Welfare and Institutions Code. The Legislature has limited such paramount jurisdiction only to specifically compelling circumstances." (In re William T., supra, 172 Cal. App.3d at p. 798; see also, Dupes v. Superior Court, supra, 176 Cal. at p. 441.)
An exception to the general rule that juvenile court jurisdiction preempts family court custody orders was suggested in In re Brendan P., supra, 184 Cal. App.3d 910. In that case, the mother (Dorothy) and the father (Bernard) fought a custody battle for Brendan in the family law division of the superior court. Dorothy had accused Bernard of molesting her two other children, and also apparently accused him of molesting Brendan as well. Following a custody hearing in the superior court, the trial court ordered joint custody with two days per week visitation to Bernard. In making this ruling, the trial court specifically found that there was no evidence Brendan had been molested by his father.[5] (Id. at pp. 912-913.)
Dorothy did not comply with the custody and visitation orders and Bernard moved to enforce and modify the visitation orders in the superior court. Pursuant to this motion, the judge ordered two eight-hour visitations.
The day after the court ordered the visitations, a section 300, subdivision (a) petition was filed in the juvenile court alleging that Brendan should be declared a ward of the court because mother was being forced to allow Brendan to visit Bernard, and Bernard had "`sexually molested and physically *195 abused Brendan's half sibling.'" (Id. at p. 913.) This petition was apparently filed at mother's request. The juvenile court sustained the dependency petition and ultimately ordered that Brendan be placed with the mother. (Id. at pp. 913-914.)
The Court of Appeal reversed the juvenile court order on the ground that father had not been given proper notice of the juvenile court dependency action. (Id. at pp. 914-916, 920.) However, in dictum, the court also addressed the jurisdictional question raised by the conflict between the superior court and juvenile court orders. Although the court acknowledged the general rule that family court orders do not preempt juvenile court jurisdiction, it was troubled because the juvenile court had assumed jurisdiction "over the precise factual and legal issue just that day resolved in another court." (Id. at p. 916.) The Brendan P. court observed: "Cases are legion which permit assumption of juvenile court jurisdiction over custody issues after there has been a custody ruling in a family law department, but in those cases the precise matters charged in the juvenile court are different than those resolved by the earlier domestic proceeding. Most usually, after award of custody to a parent, subsequent events may show the parent is unable to care for the child, thus requiring the state to step in as a party bringing a protective custody action." (Id. at p. 917.) In short, the Brendan P. court believed it was impermissible for a juvenile court to relitigate issues which are "identical" to those already litigated in the family law department of the superior court. (Ibid.)
(1b) We need not decide whether the dictum in Brendan P. is good law since, in any event, the issue decided by Judge Premo in the juvenile court is not "identical" to any of the issues litigated by Judge Gordon in the superior court. In the superior court, Judge Gordon considered mother's allegations of specific misconduct against father. These included allegations that father had sexually molested Anne, had used cocaine in her presence, had exposed the child to improper photos of male genitalia, had exposed himself to the child, and had taken improper nude photographs of the child. Judge Gordon found that none of these allegations were true. In addition, father sought sole custody on the ground that the original shared custody agreement had not worked out, that mother was unwilling to share custody with father and had frustrated his visitation rights, that mother had made false accusations against father which had caused Anne to be exposed to the trauma of litigation, that mother had denigrated father by falsely asserting that he was not Anne's father, and that mother was mentally unbalanced, causing her to act irrationally and contrary to the child's best interests.
By contrast, the focus in the juvenile court shifted away from the validity of the parents' allegations against one another, and focused instead on the *196 effect the long struggle between the parents was having on Anne. The petition on which juvenile court jurisdiction was sustained alleged that Anne "has suffered psychological harm as a direct result of interaction with one or both of her natural parents and her parents have been unable to provide for the psychological well being of the minor; further, because the minor has special needs due to the family dynamics, the minor requires the assistance, protection and services of the Juvenile Court...." Judge Premo's decision to make the child a ward was based on his belief that the child was suffering from a severe psychological disturbance and that this disturbance was caused by the ongoing struggle between the mother and father.
In our view, the issue litigated by the juvenile court was not identical to any of those litigated by the superior court. Indeed, most of the evidence introduced at the juvenile court proceeding concerned events and observations which occurred after Judge Gordon issued his order. Although the concerns in both actions may have been similar  the welfare of the child  the precise issues were not. Accordingly, we are not convinced that this case falls within the exception suggested by In re Brendan P.
Finally, father cites Greene v. Superior Court (1951) 37 Cal.2d 307 [231 P.2d 821], for the proposition that between courts of concurrent jurisdiction the court first acquiring it exercises exclusive jurisdiction. Greene, however, did not involve a conflict between superior court and juvenile court jurisdiction.
In Greene, the Santa Barbara County Superior Court issued an order in a divorce proceeding awarding custody of the children to the mother with visitation rights in the father. Mother then moved to San Francisco and, in the San Francisco County Superior Court, petitioned to have herself appointed guardian of the children's persons. In the petition for guardianship, the mother sought to substantially alter father's visitation rights. Relying on the general rule that when two courts have concurrent jurisdiction, the court first assuming jurisdiction retains it to the exclusion of all other courts, the Supreme Court held that the San Francisco County Superior Court had no jurisdiction to appoint mother as guardian for the children. (Id. at pp. 308-312.) (2b) Importantly, the Supreme Court in Greene did not discuss the exception to this general rule which it had itself articulated in Dupes v. Superior Court, supra, 176 Cal. at pages 441-442 and Svoboda v. Superior Court, supra, 190 Cal. at pages 731-732, namely: "that the fact that the superior court, in an action for divorce, ha[s] made an order providing for the custody of the minor children of the litigants [does] not deprive the *197 juvenile court of jurisdiction to dispose of such children in any manner it might deem best for their welfare." (Svoboda, supra, 190 Cal. at pp. 731-732; see also, In re William T., supra, 172 Cal. App.3d at p. 797.) Nothing in Greene alters this rule.
(1c) Moreover, Greene itself acknowledged that mother could have properly petitioned for guardianship in the Santa Barbara County Superior Court. (Greene, supra, 37 Cal.2d at p. 312.) Thus, Greene was not concerned with jurisdictional conflicts between different departments of the same county superior court, but instead was concerned only with conflicts between courts in different counties. (Ibid.) Of course, this case does not present that problem.
In sum, we conclude that the superior court's custody order did not preempt the juvenile court's jurisdiction in this case.

B. Father Was Not Deprived Of Due Process
(3) Without citing any authority, father baldly asserts he was denied due process on a variety of grounds. We disagree.
As we understand it, father's primary argument is that he was denied due process because the original petitions indicated that the primary focus of the trial would be mother's allegations of sexual molestation, but the August 11 petition and the juvenile court's rulings at trial shifted the focus of trial away from these allegations and onto the ongoing conflict between the parties and the effect the conflict was having on Anne's psychological state. In father's words, "the new petition and the court's redrafting of that petition violated [father's] due process in that he did not have an opportunity to produce any evidence regarding the child's state of mind." In other words  although father is apparently unwilling to say as much  he is contending that he was not provided with adequate notice of the theory on which the case was actually tried. We disagree.
The section 300, subdivision (a) petition filed in April of 1986 put appellant on notice that the struggle between the parents would be an issue at trial. The petition stated in part that the "minor is subjected to extreme family conflict due to the ongoing battle between said minor's natural parents over said minor's custody." The August 11 section 300, subdivision (a) petition  which was filed three weeks before trial commenced  clarified this allegation by stating that the "minor has suffered psychological harm as a direct result of interaction with one or both of her natural parents and her *198 parents have been unable to provide for the psychological well being of the minor; further, because the minor has special needs due to the family dynamics, the minor requires the assistance ... of the Juvenile Court." Father has not claimed that the petitions were untimely or improperly filed in any manner. Moreover, father did not seek a continuance to gather evidence regarding Anne's state of mind, despite the juvenile court's invitation to present evidence on this issue. In light of the notice provided by the petitions and appellant's failure to seek more time to gather the evidence he now claims he needed, we find his claim that his due process rights were violated untenable.
Father also contends that it was unfair for the trial court "to limit the evidence to the psychological well being of the minor child at the time of trial." The gravamen of father's complaint seems to be that, in father's view, the juvenile court prevented father from presenting evidence which would show that Anne's psychological problems existed at the time she was placed into protective custody and that those problems were caused by mother's repeated allegations of sexual abuse. We have read appellant's record citations on this point and find the juvenile court made no such order. In fact, the record indicates that the juvenile court would have allowed testimony concerning any events following the custody hearing. Moreover, father has cited no authority which supports his contention that such an order would violate due process.

C. The Juvenile Court Could Properly Adjudge Anne A Dependent Child Based On The Facts Presented At Trial
(4a) Finally, father contends that there was insufficient evidence presented at the hearing to sustain juvenile court jurisdiction under section 300, subdivision (a).[6] This statute provides that a minor may be adjudged a ward of the juvenile court if the child "is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising care or control, or has no parent, guardian or custodian actually exercising care or control." (Italics ours.)
(5) "The standard of proof required in a Welfare and Institutions Code section 300 dependency hearing is the preponderance of the evidence. (See § 355.) `If there is any substantial evidence to support the findings of the juvenile court, a reviewing court must uphold the trial court's findings. All *199 reasonable inferences must be drawn in support of the findings and the record must be viewed in the light most favorable to the juvenile court's order.'" (In re Amos L. (1981) 124 Cal. App.3d 1031, 1036-1037 [177 Cal. Rptr. 783], citations and fn. omitted.)
(4b) Here, the juvenile court sustained the section 300, subdivision (a) petition because the court believed Anne was suffering from a severe psychological disturbance which was caused by the unrelenting struggle between her parents. Further, the court found that the parents were unable to cease this conflict, and that Anne would be subject to continued harm if the court did not intervene.
Although the evidence is by no means overwhelming, given the deference we must accord a juvenile court's factual findings, we believe there is substantial evidence to support the findings of fact in this case. First, there was ample evidence that Anne was in fact disturbed. Both the probation officer and the foster mother testified that Anne acted in a highly disturbed manner. Further, Anne's psychological problems were manifested in part by her near morbid fear of men.
The evidence concerning the cause of Anne's psychological problems is more ephemeral. As indicated, mother and father's inability to agree on even a temporary custody order pending trial indicates their inability to work together to deal with Anne's problems. (See FACTS, pt. C(2), ante, at p. 190.) Father himself seemed to admit that Anne's problems were caused by the conflict between the parents when he stated that Anne "needs to have these problems stopped." When asked to elaborate on what he meant by "problems," father replied: "Repeated false allegations about molest, repeated court appearances, repeated problems in the life of a young child." Father was also uncooperative during the court proceedings, indicating an inability or unwillingness to deal with the problems at hand. He was absent from much of the jurisdictional hearing because of work commitments despite the court's repeated suggestions that he be present. Finally, once the juvenile court indicated it was going to make Anne a ward, father declined to participate at all in the dispositional phase of the hearing.
The juvenile court, concerned that the flavor of the case would not be adequately relayed to an appellate court by a cold record, took care to summarize its observations of the interaction between father and mother. In the court's words: "What is going on is pure out and out hatred, anger, ... antagonism towards the other person.... That is what this case is all about. And the child pays the price. [¶] [] The appellate court should know that in my judgment the effect [sic] of both mother and father is totally inappropriate as to what has been going on in their lives, and all you have to *200 do is look at them and listen to them and you know something is not right." It is precisely this type of firsthand observation which is the reason appellate courts defer to the factual findings of trial courts. Consequently, we find that the juvenile court's factual findings are supported by substantial evidence.
The facts found by the trial court support a dependency finding under section 300, subdivision (a). (6) "Few cases have attempted to define `proper and effective parental care or control' (see In re J.T. (1974) 40 Cal. App.3d 633, 637 [115 Cal. Rptr. 553]), since in most cases, as in this case, it is easier to describe what is not proper parental care and control. It is clear, however, that the term is determined by external standards and that `[i]t is the conduct of the parent which determines whether he or she is capable of exercising proper parental control.' (In re Corrigan [(1955)] 134 Cal. App.2d 751, 756 [286 P.2d 32].)" (In re Edward C. (1981) 126 Cal. App.3d 193, 202 [178 Cal. Rptr. 694].)[7]
(4c) Here, the conduct of the parents indicates that they are incapable of dealing with the psychological problems they have created for Anne, and that they are incapable of exercising proper parental control. In the juvenile court's words, "Neither parent for whatever personality deficiencies they have are able to break off that struggle [between them] or to lessen its intensity in any way." Consequently, Anne continues to suffer.
The only case father has cited in support of his substantial evidence argument  In re Jennifer P. (1985) 174 Cal. App.3d 322 [219 Cal. Rptr. 909]  is completely inapposite. In that case, the Court of Appeal reversed a dependency finding under section 300, subdivision (d). The child had been sexually molested by her father; thereafter, mother took prompt steps to prevent the child from having any contact with father, including pursuing a criminal action against him. On these facts, the Court of Appeal found juvenile court jurisdiction under section 300, subdivision (d) improper. There is nothing in Jennifer P. which is helpful to our analysis.
Finally, the result the trial court reached in this case may seem, to some minds, unjust. However, father does not attack the disposition on appeal. Moreover, father himself brought about the result in part because of his *201 refusal to participate in the dispositional phase of the hearing. The juvenile court expressed its belief that the dispositional phase would be the real "meat" of the case. Father, however, refused to participate in that phase of the trial and consequently forced the juvenile court into the dispositional decision it made. In short, had father participated, he may have maintained custody of Anne, albeit under the supervision of the juvenile court. We can appreciate father's frustration, but in this case his anger did not serve him well.
The judgment is affirmed.
Agliano, P.J., concurred.
BRAUER, J.
I join in the result but only because the father expressly declined to challenge the dispositional order giving custody of the child to the mother.
I agree with the majority that the psychological harm suffered by the child as a result of the destructive interaction between the parents justified juvenile court intervention, that the evidence amply supported the finding and that the family court had not adjudicated that precise issue. Compare In re Brendan P. (1986) 184 Cal. App.3d 910 [230 Cal. Rptr. 720].
But even though the order is not appealed from, I must express my concern at the disposition which placed the minor in her mother's home where 1) the family court after an exhaustive hearing had determined that the mother was primarily responsible for the child's plight; indeed, that "whether [mother] acted consciously and deliberately to harm [father] or was subconsciously motivated by angry and aggressive feelings towards him ... the effect has been to cause great and unnecessary pain, hardship and disruption to the lives of many people, including the very person [mother] intended to protect [namely Anne]" and 2) the decision did not appear to have been based on altered circumstances of such magnitude as to justify a change in custody under the criteria laid down in In re Marriage of Carney (1979) 24 Cal.3d 725 [157 Cal. Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028]. Given the nature of the family court's findings quoted above, it is difficult to imagine that that type of leopard can change those kinds of spots. I did not see such evidence in the record.
It is true, of course, that the juvenile court's hands were tied to a degree because the father gave up the fight after the jurisdictional finding was made. But who can blame him? He incurred more than $50,000 in attorneys fees, not to speak of the emotional trauma, in defending himself against the molestation charges. After gaining vindication in the strongest language a *202 judge could possibly utter, he found that he had to start all over again, only this time against a government adversary paid at public expense. What second wife would be expected to tolerate such a psychological stress and economic drain?
The juvenile court took action primarily on the basis of the child's condition. But the family court had categorically found the mother primarily responsible for that condition. In the absence of compelling evidence and a clear finding that her conduct and proclivities had changed, the dispositional order of the juvenile court runs counter to the policy designed "... to prevent unseemly conflict between courts that might arise if they were free to make contradictory custody awards...."[1] (Greene v. Superior Court (1951) 37 Cal.2d 307, 311 [231 P.2d 821].)
NOTES
[*] Assigned by the Chairperson of the Judicial Council.
[1] Subsequent statutory references are to the Welfare and Institutions Code, unless otherwise noted.
[2] Judge Gordon stated: "With regard to the foregoing findings, the Court notes that a finding that [mother] had failed to sustain her burden of proof with respect to each of those allegations would have been legally sufficient. However, because of the potentially damaging effect each of these allegations could have upon the reputation, career, and future relationships of [father] with his daughter and others, and in order to erase any doubt in anyone's mind as to the extent of this Court's findings, the Court has gone further than that which was legally necessary and by doing so has intended to indicate by its findings that not only has [mother] failed to present sufficient evidence to prove her charges but the [father's] evidence has been more than sufficient to convince this Court that none of the [mother's] allegations are true. The difference is more than one of semantics. It is intended to indicate to anyone who may be concerned with this matter, including but not limited to future courts who may review this file, that this Court has no doubt that [father] is totally innocent of the charges brought by [mother] and that all of [mother's] charges are unfounded."
[3] This subdivision provides that a minor may be made a dependent of the juvenile court if the minor's home "is an unfit place for him or her by reason of neglect, cruelty, depravity, or physical abuse of either of his or her parents...." (§ 300, subd. (d).)
[4] This subdivision provides that a minor may be made a dependent of the juvenile court if the minor is a person who "is in need of proper and effective parental care or control and has no ... parent or guardian willing to exercise or capable of exercising care or control, or has no parent, guardian or custodian actually exercising care or control." (§ 300, subd. (a).)
[5] The opinion does not clearly specify whether the trial court also found that father had not molested the other children.
[6] Although father does not describe this argument as a substantial evidence attack, he is in fact arguing that the evidence was insufficient to sustain the jurisdictional finding.
[7] Dependency orders under section 300, subdivision (a) have been upheld in a broad spectrum of circumstances, ranging from the infliction of severe corporal punishment or the possibility that severe corporal punishment may be inflicted on a child (In re Edward C., supra, 126 Cal. App.3d at pp. 202-203) to a mother's failure to maintain a sanitary home (In re Jeanette S. (1979) 94 Cal. App.3d 52, 58-59 [156 Cal. Rptr. 262]). (See also In re Corrigan, supra, 134 Cal. App.2d at pp. 753-756 [mother slow to report sexual molestation of children by father; later entered into adulterous relationship]; In re Jon N. (1986) 179 Cal. App.3d 156, 161 [224 Cal. Rptr. 319].)
[1] I recognize but do not consider it highly significant that the child will remain under the aegis of the juvenile court while in the physical custody of the mother.