[No. G008646. Fourth Dist., Div. Three. Feb. 26, 1991.]

In re BENJAMIN D., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v.
HERBERT D., Defendant and Appellant.

**COUNSEL**

Stefanie A. Sada, under appointment by the Court of Appeal, for Defendant and Appellant.

Adrian Kuyper, County Counsel, and David Beales, Deputy County Counsel, for Plaintiff and Respondent.

Harold LaFlamme and Deborah M. Gmeiner, under appointments by the Court of Appeal, for Minor.

## OPINION

**SILLS, P. J.**—Herbert D. appeals from an order judging his son, Benjamin, to be within the jurisdiction of the juvenile court. Benjamin's mother Yobby does not appeal the order, which leaves undisturbed her physical custody of Benjamin. Herbert asserts there was insufficient evidence to establish juvenile court jurisdiction. We disagree.

### FACTS

Herbert and Yobby married in February 1985. Benjamin was born in February of the following year.

The day after Yobby and Benjamin returned from the hospital, Herbert took the family to a park. The day was cold and windy. Herbert took off all the sheets on the baby. When Yobby tried to cover Benjamin, Herbert accused her of wanting to raise Benjamin as a little girl.

Later that day, Herbert took the family to a local Taco Bell. He opened Benjamin's mouth like a little bird and poured a packet of hot sauce into Benjamin's mouth. Benjamin cried; Herbert laughed.

Herbert lived with Yobby about nine months after Benjamin's birth. During this time Benjamin slept on the floor because Herbert did not want to buy Benjamin a crib. When the weather was cold, Yobby would try to put a sweater on Benjamin. Herbert would not let her. Apparently as result of this exposure, Benjamin developed whooping cough and pneumonia.

Herbert would also frequently throw Benjamin into the air. When this happened, Benjamin was usually hurt in some way.

While Herbert and Yobby were together, Herbert would hold Benjamin under a shower and scold him in order to stop him from crying. This occurred on a daily basis. When Benjamin soiled his diapers, Herbert would hold Benjamin's buttocks under a water faucet or cold shower. The cold water caused Benjamin to turn purple.

Herbert would also beat Yobby. During their marriage, he would throw her on the floor, sit on her, and hit her in the face with his fist. He would also pinch her, leaving bruises. Yobby's son Hiram saw Herbert beat his mother two or three times. Hiram himself was threatened twice by Herbert. Once, Herbert grabbed Hiram by the shirt and told Hiram to "fight like a man" or he would kill him. Another time, when Hiram was staying with his natural father, Herbert phoned him and said he would kill him if he saw Hiram with Yobby.

Herbert and Yobby separated in November 1986. Benjamin stayed with Yobby and Herbert would pick him up to visit him. Visitation, however, was a continuing source of trouble. When Herbert would come to pick up Benjamin, he would cry and turn pale. He was afraid of Herbert and would cling to his mother. Once, Herbert threw him in the car. Another time, Herbert pushed him in, and slapped his face. Herbert would also pull Benjamin's hair. In May 1988, Herbert returned Benjamin with pinch marks on his arms and body. In fact, Benjamin "always" returned from visitation with pinch marks.

The day after Herbert and Yobby separated, Yobby filed for dissolution of the marriage. The action resulted in a judgment giving both parents legal custody and Yobby primary physical custody of Benjamin. Herbert received visitation on alternate Saturdays and three hours on every Wednesday evening.

Sometime after the judgment, Yobby brought an order to show cause (OSC) to modify, among other things, Herbert's visitation rights. The OSC was heard in August 1988. The trial court made it clear it did not consider any misconduct on Herbert's part prior to the judgment to be relevant. Despite this, Yobby managed to testify about the hot sauce incident and Herbert's holding Benjamin under cold water after he had soiled his diapers. Yobby also presented evidence of Benjamin's return in May with many bruises and pinches on his body. And she presented evidence of Benjamin's fear when Herbert would pick him up for visitation.

The court concluded it would partially modify the existing order. It continued joint legal custody with both parents. It continued primary physical custody with Yobby. Herbert lost his Wednesday visitation rights. Instead of alternating Saturdays Herbert was given visitation on the first, third and fifth Saturdays of every month.

On Saturday, January 14, 1989, Herbert picked up Benjamin for visitation. Herbert returned Benjamin about 6:30 p.m. At 7 p.m. Yobby noticed three blue bruises on Benjamin's stomach, each about the size of a nickel.

The next day she noticed pinch marks on Benjamin's arm. That Sunday, Yobby called child protective services.

A senior social worker examined Benjamin several days later.[1] The social worker saw some very faint marks on Benjamin's arm which looked like bruises. The social worker talked to Benjamin to find out what caused the marks. As a result of what Benjamin said, the social worker contacted the Santa Ana Police Department to have Benjamin taken into protective custody. The social worker believed Benjamin was at risk from his father.

On January 30, 1989, the social worker filed a petition to declare Benjamin a dependent child. The petition recited the recently discovered bruises. It also referred to Herbert's having held Benjamin in the shower and Benjamin's resistance to visitation. The petition was later amended to allege other incidents, including Benjamin's return from visits with Herbert with unexplained bruises.

A contested jurisdictional hearing commenced in May 1989. The hearing concluded on July 12, 1989. The court declared Benjamin to be a dependent child of the Orange County Juvenile Court under section 300, subdivisions (a) and (i) of the Welfare and Institutions Code. The court released Benjamin to Yobby under the supervision of the social services department. The court found the allegations of all counts of the social worker's petition to be true by a preponderance of the evidence. The court allowed Herbert monitored visitation with Benjamin by a social worker for one hour, once a week. The court also allowed Herbert an additional visit per week for a duration of up to four hours at the discretion of the assigned social worker.

Herbert appeals from the July 12, 1989, order.

## DISCUSSION

 Herbert argues the juvenile court had insufficient evidence to establish jurisdiction under Welfare and Institutions Code section 300, subdivisions (a) and (i)[2] He asserts the bruises discovered by the social worker in January 1989 constitute the only additional evidence not otherwise

---

[1] The record is not clear as to precisely when the social worker arrived to examine Benjamin. Yobby testified a social worker arrived on the 19th or 20th. The social worker testified he examined Benjamin on the 26th.

[2] Welfare and Institutions Code section 300, subdivision (a), provides that a minor who has suffered, or who faces a substantial risk of suffering, serious physical harm inflicted nonaccidentally by his or her parent or guardian may be adjudged a dependent child of the juvenile court. Section 300, subdivision (i), provides that a minor who has been subjected to an act or acts of cruelty by his or her parent or guardian or member of his or her household may be so adjudged.

considered by the family law court in the OSC concluded in August 1988. He reasons these bruises are insufficient to establish juvenile court jurisdiction.

Herbert's analysis is incorrect because the juvenile court could properly consider evidence of Herbert's conduct with Benjamin prior to the August 1988 decision of the family law court. That evidence, along with the January 1989 bruises, *is* sufficient to establish juvenile court jurisdiction.

Quite obviously, prior consideration of the custody of a minor by a family law court cannot deprive a juvenile court of jurisdiction to make orders to protect the minor. (*Dupes* v. *Superior Court* (1917) 176 Cal. 440, 441-442 [168 P. 888] [holding custody order of superior court in divorce action did not deprive the juvenile court of jurisdiction to intervene on children's behalf]; *In re Anne P.* (1988) 199 Cal.App.3d 183 [244 Cal.Rptr. 490] [affirming juvenile court dependency finding based on new molestation charges against father after family law court had found no evidence to support molestation charges against father one year before]; see also *In re Brendan P.* (1986) 184 Cal.App.3d 910, 917 [230 Cal.Rptr. 720] ["Cases are legion which permit assumption of juvenile court jurisdiction over custody issues after there has been a custody ruling in a family law department . . . ."].) The purposes and parties of family law and juvenile proceedings, while often overlapping,[3] are not the same. The family law court adjudicates the rights of private parties vis-à-vis each other. The juvenile court takes into account the interest of the state as the guardian of persons with legal disabilities. (*Dupes* v. *Superior Court, supra*, 176 Cal. at p. 441.)

Accordingly, a juvenile court is not required to exclude evidence that may have already been presented in a family law forum. As *Dupes* made clear, a juvenile court may properly consider evidence of a parent's past conduct, regardless of whether such evidence may have been adduced in another proceeding where the parties and issues were not the same. (176 Cal. at p. 442.)

In this case, the focus of the family law court at the August 1988 OSC was whether circumstances existed warranting modification of the custody

---

[3] The issue of overlapping subject matter between family law, juvenile, and other courts dealing with children has not gone unnoticed by either the Legislature or the Judicial Council of California. Recently the Legislature mandated a pilot program concerning child victim witnesses which has among its goals developing "special relationships among different courts" when child victim witnesses are involved. (Pen. Code, § 14002, subd. (c)(2).) See also Report of the Judicial Council Subcommittee on Gender Bias in the Courts: Evaluation, List of Modified Recommendations, and Comments (1990), Tab 3—Family Law, Recommendation 14, at pages 11-12 (calling for the development of protocols for the coordination of family, juvenile, and other departments "when a child is involved in overlapping proceedings").

and visitation arrangements set forth in the earlier judgment dissolving Herbert and Yobby's marriage. Accordingly, the court made it clear it did not consider evidence of Herbert's conduct with Benjamin prior to the making of the judgment to be relevant.

The focus of the juvenile court, on the other hand, was whether Benjamin came within section 300 of the Welfare and Institutions Code. The juvenile court's proper concern was whether Benjamin had been abused and, if so, how to safeguard him from repeated attacks. (See *In re Steve W.* (1990) 217 Cal.App.3d 10, 19 [265 Cal.Rptr. 650].) Evidence of Herbert's past conduct toward Benjamin would necessarily be relevant to the issue of prior abuse and vulnerability to future attack. There was, therefore, no reason for the juvenile court to limit the evidence before it to developments after the August 1988 family law court decision.

Herbert's analysis fails to distinguish between the relitigation of facts and whether a given amount of evidence brings a minor within section 300. It is one thing for a family law court to find a given fact true (e.g., whether, on a given date, a parent sexually molested a minor). It is quite another for a juvenile court to find that a given set of facts (including some which may have been determined true in a prior family law proceeding) makes section 300 applicable.[4] Facts which show the threat of future physical injury to a minor are necessarily cumulative. A juvenile court must not shut its eyes to facts pointing to the threat of future injury just because those facts may have been previously aired in a family law forum.[5]

[4] The findings of the family law court at the August 1988 OSC were, at best, equivocal. With the exception of certain skin abrasions on Benjamin's legs which the court expressly stated were not caused by Herbert, it is unclear what the court found. In any event, the department of social services was not a party to the earlier proceeding, and there is no basis to deem it in privity with Yobby. California law distinguishes between the legal rights of parents in custody disputes and the protection of a minor child by the state. (See *In re William T.* (1985) 172 Cal.App.3d 790, 798 [218 Cal.Rptr. 420].) It is one thing for a family law court to determine the best interests of the child as between two parents under title 4 of the Family Law Act (Civ. Code, § 4600 et seq.). It is quite another for a juvenile court to determine the best interests of the child in a proceeding where there is the possibility both parents could lose custody or visitation rights. Accordingly, the doctrines of res judicata and collateral estoppel do not apply in this case.

[5] This is particularly important when the issue of domestic violence against a spouse, as in this case, is also present. Both common sense and expert opinion indicate spousal abuse is detrimental to children. (See Achieving Equal Justice for Women and Men in the Courts, Draft Rep. of the Judicial Council of Cal. Advisory Com. on Gender Bias in the Courts (1990), tab 6, p. 37 ["Every study reviewed by the committee indicates that spousal abuse is detrimental to children and must be considered a significant factor in custody decisions."].) In the past, family law courts adjudicating custody or visitation arrangements have not focused on spousal abuse as a factor in making an appropriate custody or visitation order. (See *id.* at tab 6, p. 47 ["While domestic violence is sometimes considered, as the judges survey clearly shows, too many times it is not."].) Accordingly, the Legislature amended Civil Code section 4608 in 1990 to require courts to consider "[a]ny history of abuse by one parent . . .

Dicta in *In re Brendan P., supra*, 184 Cal.App.3d 910, relied on by Herbert, is inapposite. In *Brendan P.*, the juvenile court petition was "collusive." (*Id.* at p. 914.) There was only one day between the making of the family law court's order and the petition's filing. (*Id.* at p. 913.) Moreover, the issues in the prior family law proceeding and the later juvenile proceeding were identical. (*Id.* at p. 916.)

Here, there was no collusion. The social worker filed the petition based on what he learned after he examined and spoke with Benjamin. A substantial period of time transpired between the prior decision of the family law court and the filing of the petition. Finally, "new" evidence of abuse after the family law court's decision had come to light.

Nor does the recent case of *In re Lawrence S.*■ (Cal.App.) alter our conclusion. *Lawrence S.* held the exercise of jurisdiction by a juvenile court in Santa Clara County based on allegations of sexual molestation was improper where the identical issues of sexual molestation had been litigated in a family law court in Santa Barbara County about 15 months prior. The factual issues were identical in both the family law and juvenile court forums.[6] Additionally, the children were represented by counsel at the earlier family law proceeding.

*Lawrence S.*, like *Brendan P.*, is distinguishable. Here there were new allegations of abuse well after the earlier domestic order. Also, Benjamin was not represented by counsel at the earlier proceeding.

Moreover, even if *Lawrence S.* and *Brendan P.* were not distinguishable, we would decline to follow them. ■ (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 772, pp. 740-741 ["One district or division may refuse to follow a prior decision of a different district or division . . . ."].) Both cases fail to take into account the statutory mandate of the juvenile court to

---

against the other parent" in making custody decisions. However, it would be inaccurate to conclude, as Herbert would have us do, the issue of spousal violence and its impact on Benjamin was determined at the August 1988 family law OSC. In fact, just the opposite conclusion is warranted here. The family law judge did not consider Herbert's misconduct prior to the judgment of dissolution—including, presumably, his beatings of Yobby—to be relevant. The juvenile court forum was thus the only forum where the impact on Benjamin of Herbert's abuse of Yobby could be litigated.

[6] In *Lawrence S.*, there was only one development after the Santa Barbara family law order. This was a suicide attempt made by one of the children when he was told that he had to visit his father. In analyzing this development, the *Lawrence S.* court considered it to be part of the same set of facts litigated in the Santa Barbara family law proceeding. "It seems farfetched in the extreme to think that the Santa Barbara court, with the ink still wet on its order, would not have been willing instantly and effectively to deal with the allegation that Michael was so frightened of his father that he would choose suicide over a visit." (*In re Lawrence S.*▌)

assume jurisdiction whenever a minor comes within one of the "descriptions" of Welfare and Institutions Code section 300. Under section 300 it makes no difference whether there is an ongoing dispute being litigated in the family law courts. Put simply, if the minor is being abused (as defined in subds. (a) through (j) of § 300), then he or she "is within the jurisdiction of the juvenile court." *Lawrence S.* and *Brendan P.*, by contrast, make the "jurisdiction" of the juvenile court depend on the nature of preceding family law litigation and its relation to the subsequent dependency litigation. In effect, these two cases potentially allow litigation between private parties to frustrate the operation of section 300.[7]

Turning now to the evidence before the juvenile court, we find it sufficient to sustain the petition. The evidence before the juvenile court showed Herbert to have a history of pinching in anger. He pinched Yobby when he threw her down on the floor and beat her. Benjamin had frequently returned from visitation with visible pinch marks. The January pinchings were sufficiently severe to leave a visible impression for at least four, and possibly eleven, days. These pinchings were also multiple and deliberate. Herbert pinched Benjamin not only on the arms, but on the stomach. Undoubtedly, these pinchings, particularly on the abdomen, entailed real physical pain on a child not yet three years old, especially in the light of the other evidence pointing to Herbert's cavalier indifference toward the infliction of physical pain on Benjamin. Such facts establish Benjamin was, indeed, subject to an act or acts of cruelty by Herbert. (Welf. & Inst. Code, § 300, subd. (i).)

Additionally, the severity of the January pinchings, when taken in combination with Herbert's indifference toward Benjamin's pain and Herbert's propensity to beat Yobby and threaten her son Hiram, establish a substantial risk Benjamin would suffer serious, nonaccidental, physical harm at Herbert's hands. (Welf. & Inst. Code, § 300, subd. (a); cf. *In re Katrina C.* (1988) 201 Cal.App.3d 540, 545-546 [247 Cal.Rptr. 784] [testimony of pediatrician about faint bruise on left cheek being "indicative of abuse rather than discipline" held to constitute prima facie evidence of child's need for proper care sufficient to support finding under prior version of section 300]; *In re Anne P., supra*, 199 Cal.App.3d 183 [psychological harm

---

[7] A theme running through both *Lawrence S.* and the *Brendan P.* dicta is the exclusive jurisdiction of the first court to exercise jurisdiction. (See *In re Lawrence S.,* ▮ quoting *Brendan P.* [" 'Where there is a conflict, California cases unequivocally endorse the proposition the first court to assume and exercise jurisdiction acquires exclusive jurisdiction.' "].) Juvenile courts, however, constitute a well-established exception to this theme. As stated in *In re William T., supra*, 172 Cal.App.3d at page 797, "when the juvenile court, acting under the doctrine of *parens patriae*, acquires jurisdiction and properly assumes custody of the minor, its jurisdiction is paramount even if acquired later in time."

as a result of "ongoing struggle" of parents justified dependency finding]; *In re James B.* (1985) 166 Cal.App.3d 934 [212 Cal.Rptr. 778] [subdural hematoma caused by violent shaking sufficient to establish injury caused by abuse].)

Herbert has not cited, and we have not found, any authority holding circumstances as egregious or less egregious than those in this case insufficient to establish juvenile court jurisdiction. He relies primarily on *Santosky* v. *Kramer* (1982) 455 U.S. 745 [71 L.Ed.2d 599, 102 S.Ct. 1388]. *Santosky* does not help Herbert's case. *Santosky* held due process requires clear and convincing evidence to "irrevocably" sever the rights of natural parents. (*Id.* at pp. 747-748 [71 L.Ed.2d at p. 603].) This case does not deal with any such "irrevocable" termination.

The juvenile court's order is affirmed.

Sonenshine, J., and Moore, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 2, 1991. Panelli, J., was of the opinion that the petition should be granted.