Filed 4/2/21  In re K.O. CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.O. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E075751 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J282677 & J282678) |
| v. | OPINION |
| J.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Affirmed.

Maryann M. Goode, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

After J.C. (mother) used her children as weapons in a bitter custody battle with their father, the juvenile court assumed jurisdiction over the children under Welfare and Institutions Code[1] section 300, subdivisions (b)(1) and (c), removed them from mother's custody, and ordered mother to participate in family reunification services. On appeal, mother contends there is insufficient evidence to sustain the court's findings. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Preliminary Background.*

From 2008 to 2018, mother and father (G.O.) had an "on-again, off-again" relationship, producing two children: G. (born in 2009) and K. (born in 2011). In 2018, the parents permanently separated, and the family court awarded joint legal and physical custody as follows: "mother [had the] primary residence for school purposes," and father had the children every weekend, plus one weekday after school. In March 2019, the family court ordered mother "not to discourage" the children from visiting their father. All visitation exchanges were required to occur at the Yucaipa or West Covina Police stations.

Sometime in 2019, father requested modifications to the custody order. A family court services counselor prepared a custody report dated September 10, 2019. The counselor interviewed the family members and discovered that father had requested custody because the children were failing in school, and he had been unable to exercise his visitation rights on a consistent basis due to mother coaching the children to refuse to

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

go with him. Father had filed approximately 20 to 30 counts of contempt against mother for withholding the children, and the police were involved. Mother expressed concerns about father's verbal and mental abuse of the children, claimed she had to force the children to visit with father, and expressed the need for coparenting classes and family counseling. Both children stated that they liked living with mother but did not really like visiting father because he would make racist remarks about African-Americans and Mexicans, which upset them because they are Mexican. G. claimed father pulled his ears and hair when he did not listen and encouraged him to misbehave at mother's home. Also, there were indications that father coached K. to make false accusations against mother's new boyfriend. The counselor recommended temporary, sole legal and physical custody be given to mother with supervised visitation to father, and that father participate in individual counseling to address his concerning behaviors.

### B. Dependency.

#### 1. Detention.

On October 4, 2019, San Bernardino County Children and Family Services (CFS) filed dependency petitions under section 300, subdivisions (b)(1) (failure to protect) and (c) (serious emotional damage). The petitions alleged the parents were struggling over custody issues, and the children were suffering because father called mother names such as "Dirty Mexican," coached the children to lie about her boyfriend, and awarded them for acting inappropriately in her care.[2] On October 7, 2019, the juvenile court detained

---

[2] The petitions also alleged that father has a substance abuse problem, but this allegation was dropped after father submitted two clean tests.

the children in mother's care, authorized supervised visitation and phone calls for father, and ordered family services.

CFS amended the petitions on three occasions: January 17, February 10, and April 30, 2020. By the time of the third amended petitions, the situation had drastically changed. According to the third amended petitions, mother exposed the children to the parents' custody battle, hindered their relationship with father, and had been arrested for absconding with the children to Texas. On May 1, the juvenile court removed the children from mother and placed them in the custody of father. The court ordered supervised visitation and phone calls for mother and services to help the family safely maintain custody of the children.

### 2. *Jurisdiction/disposition report and hearing.*

According to the jurisdiction/disposition report filed June 2, 2020, CFS recommended that custody of the children be granted to father, a family law custody order issue, and the dependency be dismissed. During April 2020, father was denied visitation because (1) mother claimed she and the children were self-quarantining because of the Covid-19 virus at the beginning of the month, and (2) mother took the children to Texas (without informing CFS) for the rest of the month.

Mother claimed that she had "always encouraged a relationship between her children and their father," but "she has concerns about [him] due to [his] threatening her . . . [and] physically and emotionally hurt[ing] the children." Mother stated she would remain in California if she had custody of the children but would move to Texas if she did not. She did not believe the children wanted to live with father. The CFS social

4

worker expressed concerns that mother would move out of the state if she obtained custody of the children.

The report contained direct quotes from text messages exchanged between mother and social worker Mailey from April 30 through May 18, 2020. Mother was angry that CFS had removed the children from her custody. Mother said the social worker should "[g]o back to school" and was incompetent. Mother also told the social worker that she was "coming for [her] and the department." On June 19, mother started a "GoFundMe" online fundraising campaign to raise money so she could retain legal assistance to address the "on-going corrupt battle with CFS."

The contested jurisdiction/disposition hearing was held on September 1 and 10, 2020. Both children testified outside the presence of their parents. G. testified that he liked living with father. He admitted that when he lived with his mother, she had told him to say things that were not true, but he hated lying because he felt horrible about it. He admitted that father never actually told him that he did not like African-Americans or Mexicans, never called mother a "Dirty Mexican," and never hit him in the face. Regarding visitation with mother, G. reported that he liked seeing her, hugging her, and playing puzzles with her; however, he felt more comfortable and safe with supervised visits and would prefer "two or three more supervised [visits] before [moving] on to unsupervised." G. wanted his "parents to get along" and the "court case to end." He had a difficult time testifying because he did not like talking about the family situation.

K. testified that she liked living with both father and mother; however, she was undecided as to which parent she preferred living with. She admitted to making things up

5

and telling lies about father's wife to stop mother from "asking questions" because she "felt like [mother] was choking" her with so many questions. She denied that father had said he did not like African-Americans or Mexicans, and she testified that he never called mother a "Dirty Mexican." Regarding mother's now ex-boyfriend, she stated that father never told her to lie nor coached her to say the boyfriend was a pervert who had touched her "in a bad way." She claimed to have "made it up on [her] own." K. was fine with supervised or unsupervised visitation with mother, but she liked the social worker's presence because then mother "doesn't have to ask a lot of questions." She wanted more visitation with mother and, eventually, to live with her.

Social worker Mailey testified that she had been assigned to the case in October or November 2019, and began interacting with mother in January 2020. While she did not believe the children were at risk with father, she did believe they were at risk with mother based on mother's failure to "follow in-court orders" and withholding "the father from visitation."

In April 2020, mother notified social worker Mailey that, due to possible exposure to the Covid-19 virus, she (mother) was self-quarantining with the children for the first two weeks of April. The social worker requested, but mother failed to provide, any documentation regarding the Covid-19 exposure. Mother also took the children to Texas for a vacation. The self-quarantine and vacation prevented any visitation with father from April 1 through 27. The social worker believed mother was not in California during this period of time. By taking the children out of the state without CFS permission, mother had violated court orders and was so advised. Mother justified her actions

because CFS had permitted father to take the children to Arizona multiple times.[3]  Upon mother's return on April 27, she was arrested.

Social worker Mailey opined that mother was causing emotional damage to the children, stating that G. "tends to get very agitated and will start hyperventilating and stutter when he is proceeded to be pushed into doing something he does not want to do." The social worker referenced two or three times when G. appeared to be upset.  On January 3, 2020, when G. was "reiterating what he had stated as far as why he didn't want to go on a visit with his father," he started to stutter and hyperventilate.  G. accused father of making negative comments about his half or stepbrother and mother, and G. asserted that father needed counseling.  By asserting father needed counseling, the social worker thought G. was being coached.  On January 24, when G. was going to visit father, he started to stutter because he was "concerned his father would be upset about the clothing" he was wearing.  Father had purchased over $500 in clothes for the children, but mother would send the children in "tattered shoes," and "ripped and torn clothing." The social worker instructed father to refrain from discussing the clothing situation with the children and said to send the children back with the same clothes they had arrived in. Also, during a video chat on April 7, 2020, G. stuttered, hyperventilated, and looked at mother when he told the social worker that father had hit him in the face.

---

[3]  The record shows father always (1) asked CFS for "permission to [take the children] out of state," at least a week or 72 hours in advance, (2) told CFS where he was going and the people "that would be around the children," and (3) only took them during his visitation time.

Mother accused social worker Mailey of being biased and unfair, and indicated she would file a complaint against the social workers and would come after them. Although she felt physically threatened and talked to her supervisor about it, the social worker testified that mother's actions did not influence her opinions in this case or affect her ability to remain fair and neutral. Mother's counsel moved to strike the social worker's testimony and any reports she was involved in preparing, "based on actual bias, prejudice and conflict of interest." The motion was denied.

Social worker Diaz testified that she was assigned to the case in September or early October 2019 and, at that time, she did not see a need to remove the children from mother. In February 2020, she recommended the children be placed with father and, in March 2020, she recommended the case be dismissed. After consulting with social worker Mailey and the social workers' respective supervisors, a safety risk assessment was conducted. The assessment concluded that the children were "[p]hysically safe" staying with mother. Although concerned about mother's behavior, ongoing visitation problems, and mother's attempts to alienate the children from father, social worker Diaz opined that the concerns did not rise to the level "for the Department to be involved." Thus, she recommended dismissal of the dependency so the custody orders would fall back to the previous family law orders.

Social worker Diaz was on medical leave from April 24 until the end of July 2020. Upon her return, and after learning the children had been removed from mother's custody on April 27, the social worker opined that father was not a risk to the children, but mother was. She explained, "[t]here are concerns that [the] children have been coached. Mother

has failed to follow the direction of [CFS] along with the Court orders and . . . we're just concerned that her isolating the kids has had a negative effect on them or will." However, the social worker acknowledged that neither child had exhibited aggressive behaviors, suffered from anxiety or depression, and they were not participating in individual counseling. In general, the social worker believed father was cooperative and mother was difficult. Social worker Diaz admitted that she had not reviewed the entire family court file nor had she spoken with the family court mediator therapist who had recommended supervised visitation for father. Mother had complained about the social worker and tried to get her in trouble.

The parties stipulated that since February 2020, mother's eldest daughter, the siblings' half sister, "never heard the mother coach the children" when she was in the home.

On September 17, 2020, mother's counsel asked the juvenile court to dismiss the dependency on the grounds CFS had failed to prove that the children suffered from severe depression, anxiety, aggression, or withdrawal. He argued the children were not in therapy, and the social worker was biased against mother and should have been recused from the case. In response, the children's counsel acknowledged that both children loved their parents, wanted to be with both of them, and wanted the fighting to stop. However, she argued the children needed to be enrolled in therapy because they were starting to exhibit signs of emotional distress, and she was concerned about the risk of further distress in the future.

9

CFS concurred but addressed mother's allegation of social worker Mailey's bias by pointing out that the "children were not removed based off of any bias. They were removed because the mother was arrested after having abduct[ed] the children on an almost four-week out-of-state trip to which she never advised the department of." During that time, mother only allowed contact with the social worker and the children on two occasions, and mother refused to admit that they were all out-of-state. Also, counsel pointed out that the social worker continued to work with mother to arrange visitation. CFS asked the court to sustain the allegations in the petitions, and "dismiss with the family law orders giving Father full custody."

The juvenile court noted the extensive custody battle between the parents, the love that both parents have for the children, and the love the children have for both parents. The court opined that the constant battle and "tug-of-war" between the parents regarding custody was harming the children because they did not have a sense of stability. G.'s physical manifestations included stuttering, hyperventilating, and "[b]y his own testimony he indicated feeling horrible about himself, feeling horrible about lying, feeling torn between the parents, [and] not wanting to let his mother down." K. seemed "confused as to how to answer [and] has no confidence in herself." As a result, the court found a "clear risk of continued neglect and emotional harm."

The juvenile court expressed its belief that both parents had been coaching the children, but there is no "specific allegation before the Court regarding the father." The court noted that once father had secured unsupervised visitation, mother began a campaign to "thwart" his visits by filing a restraining order, alleging physical abuse, and

encouraging the children to make similar allegations. Mother interfered with father's visitation by self-quarantining with the children and taking them out of the state during April 2020. She refused to provide CFS with any information on her new husband so he could be fingerprinted, and she opened a "GoFundMe" online fundraising campaign to raise money in violation of court orders. The court faulted mother for manipulating the court process and demonstrating a pattern of behavior "in an effort to beat the father in Family Law Court despite the fact that it's emotionally damaging her children."

Based on the evidence, the juvenile court sustained the allegations under section 300, subdivisions (b) and (c), removed the children from mother's custody, placed them with father under CFS's supervision, and ordered supervised visitation with mother. The court observed that if it were to terminate the dependency with family law orders, "either Mother and/or Father and/or both would be immediately in Family Law Court tomorrow filing for a request to change and the cycle would continue for the next ten years and that the children would again, be in the middle of the parents' battle with each other." The court ordered services for the parents, including individual therapy, conjoint therapy, and coparenting classes, with mother to participate in a psychological evaluation and parenting program. The court opined that the children were in dire need of services and ordered an immediate referral for therapy.

## II. DISCUSSION

Mother challenges the juvenile court's jurisdictional findings. She claims section 300, subdivision (b), applies to neglect cases, not emotional abuse cases, and the evidence in this case does not establish the criteria required by section 300,

11

subdivision (c). "We address only the latter, since the juvenile court's jurisdiction may rest on a single ground." (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127.)

"'On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citation.] Substantial evidence is evidence that is reasonable, credible, and of solid value.'" (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 84.)

Mother agrees that "[l]ike many other children whose parents are going through custody battles, the children in this case were upset," but she argues "their emotional issues and behaviors set forth in the record failed to meet statutory requirements." She points out that the "social workers kept waffling back and forth as to whether this case was a family law case or a dependency case," and they provided "very little about the children's assessment reports or their therapeutic needs." She asserts that "it was the juvenile court who seemed more concerned about their emotional status and physical manifestations of emotional harm." We disagree.

Section 300, subdivision (c), states that the juvenile court may adjudge a child to be a dependent child of the court when the "child is suffering serious emotional damage, or is *at substantial risk of suffering serious emotional damage*, evidenced by *severe anxiety*, depression, withdrawal, or untoward aggressive behavior toward self or others, *as a result of the conduct of the parent . . . .*" (Italics added.) "Although 'the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to

12

the defined risk of harm' [citation], the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.] A parent's past conduct is a good predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.'" (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

From the inception of their custody battle, both parents made false statements against each other and showed no desire to cooperate or coparent. Mother significantly minimizes the emotional suffering her children experienced due to the custody battle. However, the fact that CFS had to intervene speaks volumes. As both children testified, they did not like being questioned or talking about their family situation. G.'s anxiety manifested in his stuttering and hyperventilation, while K. felt like she was choking. The social worker and the juvenile court observed the physical manifestation of the children's distress. While there is evidence that both parents coached the children on what to say, mother seemed unlikely to stop absent judicial intervention. Father submitted on the jurisdictional findings, accepted responsibility for his role, and was prepared to provide the children with the necessary means to overcome their distress. Mother refused, choosing to pit the children against father at the time of the hearing. As G. stated, since he has been living with father, father has told him to "be honest and just tell the truth." Regarding mother, G. liked supervised visits because the social worker was there to take notes, listen, and watch.

Mother asserts an analysis of the facts in five cases support a reversal in this case: *In re Anne P.* (1988) 199 Cal.App.3d 183, 191 [child exhibited symptoms of profound emotional dysfunction and both parents were unwilling to recognize or change their destructive behavior; jurisdiction affirmed]; *In re Alexander K.* (1993) 14 Cal.App.4th 549, 558-561 [jurisdiction was reversed for insufficient evidence parents caused the child's emotional problems]; *In re Christopher C.*, *supra*, 182 Cal.App.4th at pp. 84-85 [substantial risk of emotional harm evidenced by the children having no difficulty falsely accusing their siblings of sexually abusing them]; *In re A.J.* (2011) 197 Cal.App.4th 1095, 1105-1106 [serious emotional damage evidenced by child's nightmares, fear of mother, and belief she was crazy]; and *In re Brison C.* (2000) 81 Cal.App.4th 1373 (*Brison C.*). Mother relies primarily on *Brison C.* and argues "this is essentially a family court case."

In *Brison C.*, the Court of Appeal held that substantial evidence did not support jurisdictional findings under section 300, subdivision (c). (*Brison C.*, *supra*, 81 Cal.App.4th at p. 1376.) Similar to this case, the child there was caught in the middle of an ongoing custody battle between his parents. The Court of Appeal concluded: "The evidence shows only that [the child], an otherwise reasonably well-adjusted child who performed well at school and displayed no serious behavioral problems,[4] despised his father and desperately sought to avoid visiting him." (*Ibid*.) The court also concluded

---

**4** We question this conclusion given the child's fear of his father, nightmares, and suicidal ideation if forced to visit or live with him. (*Brison C.*, *supra*, 81 Cal.App.4th at p. 1377.)

14

there was no evidence that he was at substantial risk of suffering serious emotional damage since "[b]oth parents have recognized the inappropriateness of their past behavior and of commenting to [the child] about the other. They have expressed a willingness to change their behavior patterns and to attend counseling and parenting classes." (*Id.* at p. 1381.) The court found there was no evidence the parents were "incapable of expressing their frustration with each other in an appropriate manner." (*Ibid.*)

Here, mother has refused to acknowledge her destructive behavior or express a willingness to change and cooperate with father. When the children were removed from her custody, she immediately accused the social workers of being biased, threatened to sue them, and initiated a "GoFundMe" online fundraising campaign to raise money in order to do so. Unlike the child in *Brison C.*, both G. and K. were behind in their studies and suffered from significant anxiety resulting from mother's unchecked instruction to paint father in a false light. When the children were placed in father's custody, he addressed their needs by requesting an individual education plan for K., utilizing "a learning plan to help get the children up to speed on their academics," and initiating the "process of obtaining counseling services through his insurance." While we agree that "[t]he juvenile courts must not become a battleground by which family law war is waged by other means" (*In re John W.* (1996) 41 Cal.App.4th 961, 975), substantial evidence supports the finding that the children are at substantial risk of becoming casualties of mother's longstanding attacks on father. As the court opined: "It's not clear to me that the focus of either parent has been on the children as much as it has been on fighting each

15

other." "We are satisfied that when, as here, children are at substantial risk of emotional harm as a result of being utilized as weapons in an ongoing familial fight, the dependency court properly exercises its jurisdiction and declares them dependent children." (*In re Christopher C.*, *supra*, 182 Cal.App.4th at p. 85.)

## III.  DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

CODRINGTON
J.

FIELDS
J.